## THE "VIRGINIA EHRMAN" AND THE "AGNESE."

A ship in tow of a steam-tug, each having its own master and crew, collided with and sunk a steam-dredge lying at anchor at a proper place, displaying good signal-lights, and having competent lookouts stationed on her decks. The tug and the ship having been libelled and seized, the former gave a stipulation for value for $16,000. Both were found to be at fault; and the court below entered a decree awarding the libellants $24,184.57 damages, with interest and costs, and directing that one half of the amount be paid by the ship, and the remaining half by the stipulators for the tug. *Held*, that the decree should be modified so as to further provide that any balance of the moiety decreed against either vessel, which the libellants shall be unable to collect, shall be paid by the other, or by her stipulators, to the extent of her stipulated value beyond the moiety due from her.

APPEALS from the Circuit Court of the United States for the District of Maryland.

The facts are stated in the opinion of the court.

*Mr. I. Nevett Steele* and *Mr. A. A. Strout* for the libellants.

*Mr. S. Teakle Wallis* for the "Virginia Ehrman," and *Mr. Charles Marshall* for the "Agnese."

Mr. Justice Clifford delivered the opinion of the court.

Ship-owners, if their ship is without fault, are entitled in a cause of collision, except where it occurs from inevitable accident, to full compensation for the damage their ship receives, provided it does not exceed the value of the offending vessel and her freight then pending; and the same rule applies where the injury is caused by the joint action of a tug and tow, if it be so alleged in the libel, and it appears that both were in charge of their own master and crew, and that each was in fault in not taking due care, or was guilty of negligence or of unskilful or improper navigation.

Litigations of the kind depend very much upon the facts and circumstances that attended the disaster, which it is often difficult to ascertain with sufficient certainty, on account of the conflict in the statements of the witnesses; nor is the present case by any means free of that embarrassment, which is somewhat intensified by the triplicate character of the controversy. Damages are claimed both of the steam-tug and her tow by the libellants, who are the owners of the steam-dredge which it is alleged and admitted was sunk by the collision and became a total loss.

Prior to the collision, the dredge was employed under a contract with the United States in deepening and widening what is known as the Craigill channel, one of the approaches to the port of Baltimore; and it is alleged that she was lying on the night in question at her proper berth on the western edge of the improved channel, carefully and skilfully anchored, with three anchors properly set to keep her in position to prosecute her work, and with two signal-lights brightly burning. While the dredge was so lying at anchor, the charge of the libel is that the ship, being in tow of the steam-tug, by the neglect and want of care and skill on the part of the masters and crews of both those vessels, ran into and sunk the anchored dredge in the channel where she was lying.

Both the steam-tug and the ship admit the collision, and that

the dredge was sunk and lost; and the libellants allege that the ship was unskilfully navigated, and that the steam-tug was in fault in sailing with her tow dangerously near to the dredge, notwithstanding there was plenty of deep water on either side of the dredge, into which she might have taken the ship without danger.

Service was made, and the owners of the respective vessels appeared and filed separate answers. Separate answers became necessary, because the owners of the steam-tug differed widely in the defence of their vessel from that set up by the owners of the ship which the steam-tug had in tow.

For the ship the defence is, that she was being towed by the steam-tug up the bay to the port of Baltimore; that she was attached to the steam-tug by a hawser fifty fathoms long, running from the bow of the ship to the stern of the steam-tug; that the master and crew of the ship were entirely ignorant of the channel leading to the port, and that they assumed no control or direction over the ship; that the ship followed closely in the wake of the steam-tug as she sailed up the bay; that as they proceeded in that direction those in charge of the ship perceived that they were passing in close proximity to a dredging-machine heading to the south, similar to that described in the libel; that just as they passed that object they perceived at a distance in the rear of the same a second dredging-machine about midway the channel, but a little nearer to the western edge of the same than the one they had just passed; and the answer for the ship alleges that the steam-tug would have run directly into the second dredge had she not starboarded her helm just in time to prevent a collision, but not in season to enable the ship to adopt the necessary corresponding precaution.

Two causes for the disaster are assigned in the answer filed by the owners of the steam-tug: 1. That the dredging-machines were improperly anchored in the middle of the channel, and on the line of the lights intended for the guidance of ships when using the channel and under way, and that the dredges should have been located nearer to the edge of the channel, which, as they allege, is only about three hundred feet wide. 2. That the collision was caused by the gross mismanagement of the ship,

and by the drunkenness, incompetency, and negligence of the pilot in charge of her navigation; and they also allege that the ship had a fair and free wind, with her topsails drawing and under full headway, and that she was not dependent upon the steam-tug either for her motion or her course.

Testimony was taken on both sides; and both parties having been fully heard, the District Court dismissed the libel as to the steam-tug, entered a decretal order in favor of the libellants as against the ship, and sent the cause to a commissioner to ascertain and report the amount of the damages.

Due report was made by the commissioner that the libellants are entitled to recover as damages the sum of $24,184.57. Exceptions to the report were filed by the claimants of the ship, which were subsequently overruled by the District Court, and a final decree entered in favor of the libellants for the amount reported by the commissioner.

Prompt appeal was taken by the owners of the ship and by the libellants to the Circuit Court, where the parties were again heard; and the Circuit Court being of the opinion that both the steam-tug and the tow were in fault, reversed the decree of the District Court dismissing the libel as to the steam-tug, and entered a decree in favor of the libellants against both of the respondent vessels for the amount of the damages allowed by the District Court, and adjudged and decreed that the same, together with the interest and cost, be equally divided between the ship and the steam-tug; and from that decree all the parties appealed to this court.

Conflicting theories are still maintained by the respective appellants.

1. Throughout, the owners of the steam-dredge have contended that both the steam-tug and the ship were in fault, and they still insist that the decree of the Circuit Court is correct, except that it fails to make provision that if either of the parties adjudged to be in fault is unable to pay the whole amount of the moiety decreed against such party, that the libellants may collect the balance of such moiety of the other respondent party.

2. On the part of the steam-tug the proposition is still maintained, that the steam-dredge was anchored in a wrong place,

and that the collision was caused by the gross mismanagement of the ship, arising from the drunkenness, negligence, and incompetency of her pilot.

3. Opposed to that, it is contended by the appellants in behalf of the ship, as follows: 1. That the steam-dredge is responsible for the accident, by reason of the place and manner of her anchorage. 2. That in any view, if the ship is held liable at all, the decree of the Circuit Court dividing the damages between her and the steam-tug should be affirmed.

Cases arise undoubtedly where both the tug and the tow are liable for the consequences of a collision, as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. *Sturgis* v. *Boyer et al.*, 24 How. 110; *The Mabey and Cooper*, 14 Wall. 204.

Official directions as to the position of the steam-dredges employed in making the excavation were given by the engineer to the superintendent, and it appears that the superintendent carried the directions into effect. They were placed in their positions pursuant to those directions; and it appears that the orders given required that they should remain in that position during the night, in order that the work could be resumed in the morning, without inconvenience or delay.

Three steam-dredges were employed by the libellants in making the excavation under their contract with the principal official engineer. By their contract they were to prosecute the work under the directions of the engineer-in-charge, and it appears that he, the afternoon before the collision occurred in the evening, directed the dredges to be placed in the respective positions where they were when the steam-tug, with her tow, attempted to sail up the channel, which is straight, and runs nearly north and south. They were employed in deepening the channel in the bay, below the mouth of the Patapsco River, as before remarked, under a contract with the United States. Being employed in the same work, they were located as follows; to wit, the first between two and three miles above the mouth or southern end of the channel; the second, which is the one that was sunk and lost, was located about a quarter of a mile

further north ; and the third and last, about a mile and a quarter north of the second.   Buoys were set on the eastern edge of the channel, as guides for mariners by night, and the steam-dredges were anchored on the western edge of the excavated channel, leaving about two hundred feet of excavated channel between the steam-dredge lost in the collision and the buoys located on the eastern edge of the same.

Evidence of the most satisfactory character was given that the steam-dredges were properly moored, and it shows that each was held in position by three anchors having two quarter-lines, one from each side, running towards the front six hundred feet, at an angle as claimed of about forty-five degrees, and a stern line running out about four hundred feet, which it is not denied were sufficient to hold the dredges firmly in position. Though securely moored, it appears that the steam-dredges were not exactly in line with each other, the second, which is the one lost in the collision, having been located half her width further to the west than the first, which was anchored a quarter of a mile lower down in the channel.

Enough appears to show that the contract of the libellants for deepening the channel was completed for the whole length between the steam-dredges and the buoys, and that the dredges were located with a view to prosecute the work of excavation on the west side of the centre line of the work for the same width, or, in other words, the channel was to be deepened to the width of four hundred feet, — two hundred feet on each side of the centre line, the eastern half of which only was completed ; from which it follows that the water in the channel east of the steam-dredges was four feet deeper than the water in the channel west of the dredges, which had only the natural depth of water.   Either channel had sufficient depth of water for the steam-tug and the ship, as the testimony clearly shows that the water west of the dredges was eighteen or twenty feet deep, and that the ship did not draw more than fourteen feet.

Examined in the light of these suggestions, as the case should be, it is clear that the proposition that the steam-dredge was anchored in an improper place utterly fails, as the proofs are clear that the steam-tug with the ship in tow had plenty of sea-room to pass up either side of the anchored dredges.   Such

being the case, it follows that the steam-dredge was without fault, as the proofs show that she displayed good signal-lights, and that she had competent lookouts properly stationed on her deck. Securely anchored as she was on the western edge of the excavated channel, there was an unobstructed passage of water east of her about two hundred feet in width and twenty-four feet deep, and with a passage west of her of equal width, where the water was eighteen or twenty feet in depth.

Vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame, by showing that it was not in her power to prevent the collision by adopting any practicable precautions. *The Batavia*, 40 Eng. L. & Eq. 25; *The Lochlibo*, 3 W. Rob. 310; *Strout* v. *Foster*, 1 How. 94; *Ure* v. *Coffman et al.*, 19 id. 56; *The Granite State*, 3 Wall. 314; *The Bridgeport*, 14 id. 119; *The John Adams*, 1 Cliff. 413.

Concede that, and it follows that the ship was clearly in fault, as the proofs show to a demonstration that if she had starboarded her helm after she passed the first steam-dredge the collision would not have occurred, and they furnish no excuse for the omission. Instead of that, the better opinion is that the ship had no lookout, and that her helm was put to port at the very moment when it should have been put to starboard. Explanations to show how the mistake happened are unnecessary, as the ship is equally in fault whether it was because the pilot was intoxicated or because the ship was without a lookout. Suffice it to say the mistake occurred, and the evidence shows that the ship is without just excuse, as the night was light and the sea was smooth. Collisions under such circumstances find no excuse where there is a good wind and a berth of sufficient width, as nothing short of bad seamanship in such a case could bring the two vessels together.

Nothing of much importance remains to be considered except the question whether the steam-tug was also in fault.

Negligence, it is alleged, was the cause of the collision; and the libellants charge that those in charge of the steam-tug were guilty of want of skill and care, as well as those in charge

of the ship, and that both the steam-tug and the ship are responsible to the owners of the steam-dredge for the damages which the collision occasioned.

Gross negligence, it is insisted, is imputable to the master of the steam-tug in attempting to tow a ship two hundred and eighteen feet long up that channel in the night on either side of the steam-dredges, especially without more knowledge of the same than was possessed by the master of the steam-tug, according to his own testimony. His knowledge of the channel appears to have been very imperfect; but he knew that the steam-dredges were there, as he admits that he saw them there when he came down from the port the same afternoon. He took the ship in tow off Annapolis, and at the time he entered into the engagement he said he would take her up the excavated channel; but when the steam-tug and tow reached the first steam-dredge, he took them the west side of the dredge, which both the tug and tow passed in safety, though not more than thirty-five or forty feet west of the starboard side, as she was lying heading south.

As before explained, the second steam-dredge was moored half her width or more further to the west than the first, so that in order to pass her in safety it was necessary that both the steam-tug and the tow should incline to port; and it appears that the steam-tug did so, and that she passed the steam-dredge without collision, but that the ship, either because she neglected that precaution or because she ported her helm, ran into the steam-dredge, striking her end on, eight or ten feet from her starboard side, with such violence that she broke and cut into the heavy timbers of the dredge for the distance of six feet, causing her to sink in the channel.

Without doubt, it was practicable for the steam-tug, with due care and good seamanship on the part of those in charge both of the steam-tug and the tow, to take the tow up to the port on either side of the steam-dredges; but we all concur with the circuit judge that it was a rash act and bad seamanship to attempt to do so in such close proximity to the anchored steam-dredge, when there was plenty of room to have given the same a wider berth.

Attempt is made to excuse the master for having selected

the western side of the steam-dredges for his passage, upon the ground that he was influenced by a signal from the first dredge; but the evidence introduced for the purpose fails to satisfy the court that any such signal was given; nor would it afford any satisfactory excuse for the steam-tug even if it appeared that the fact was so, as it was still the duty of the steam-tug to have given a wider berth to the anchored steam-dredges. Such an experiment was wholly inexcusable, as there was plenty of sea-room still further to the west to have enabled the tug and tow to have passed up the channel without danger of collision with the anchored steam-dredges.

Certain exceptions were taken to the commissioner's report in the District Court, but inasmuch as they were not pressed in the Circuit Court nor assigned for error here, they are overruled.

Innocent parties in a case of collision are entitled to full compensation for the injuries received by their vessel, unless it occurred by inevitable accident, provided the amount does not exceed the amount or value of the interest of the other party in the colliding ship and her freight then pending. 9 Stat. 635; *The Atlas*, 93 U. S. 302; *The Alabama and the Game-cock*, 92 id. 695; *The Washington and the Gregory*, 9 Wall. 513.

Where the charge in such a case is joint, it is correct to divide the damages; but still the injured party, if without fault, is entitled to full compensation, and it follows that if either of the faulty parties is unable to pay the whole of his moiety, it is, in general, the right of the injured party to collect the balance of the other faulty party. No such provision is contained in the decree of the Circuit Court, probably for the reason that the stipulation for value given in behalf of the steam-tug greatly exceeds the amount of a moiety of the damages and costs awarded to the libellants. But such a stipulation is merely a substitute for the vessel, and in view of all the circumstances it is deemed proper that the decree shall conform to the settled practice.

Tested by these suggestions, it follows that the decree of the Circuit Court must be modified in that particular.

*Decree, as modified, affirmed.*