## SEABROOK v. RAFT OF RAILROAD CROSS-TIES.

*(District Court, D. South Carolina. November 6, 1889.)*

**1. ADMIRALTY JURISDICTION—COLLISION—RAFTS.**

Rev. St. U. S. § 3, defines "vessel" as including "every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation by water." *Held*, that a raft made of cross-ties, used as a convenient mode of bringing them to market, manned by a pilot, crew, and cook, who lived and had shelter thereon during the voyage, which lasted many days, and propelled by the tides and by poles and large oars, was a vessel, so as to give jurisdiction to admiralty of a libel *in rem* against it for a collision on navigable waters.

**2. COLLISION—NEGLIGENCE—EVIDENCE.**

A dredge 20 feet wide by 60 feet long, having a lighter 40 feet long and 14 feet beam on one side, and a smaller one on the other, was at anchor at night in a navigable river not less than 1,000 feet wide, and lay two-fifths of the width of the channel from one shore. She carried the legally required light to indicate that she was at anchor, and the river was straight for about half a mile. She had out 6 anchors, and no means of locomotion. There were no range or shore lights. A pilot on a raft 100 feet square, floating down the stream, who had had long experience, saw the lights on the dredge long before he reached her, but having never seen a vessel at anchor there, and thinking she was in motion, took no precautions until within 150 yards. He then went promptly to work, and nearly escaped collision, but, owing to having another raft attached, collided with the dredge. The raft had no regulation light, but had a large fire on it. The evidence was conflicting as to whether the raft's crew and the men on the dredge were asleep. The raft had been on that side of the river nearest which the dredge lay, but when the latter was discovered to be at anchor it was pushed to the other side. The river was of a uniform depth of 8 feet, shoaling towards the shore. One end of the raft took bottom, and the current swung the other end around, causing the collision. *Held*, that the dredge was not in default, but that the pilot's misreading the signals was negligence, rendering the raft in default.

**3. SAME—DAMAGES.**

Damages for such collision include cost of repairs, compensation for loss of time within which repairs should have been made, and reimbursements for expenses incurred in saving property, but not punitive damages.

In Admiralty. Libel for collision.

*W. H. Parker, Jr.*, for libelant.

*I. N. Nathans*, for claimant.

SIMONTON, J. The libelant is the owner of a steam-dredge used in mining phosphate rock from the bed of navigable streams. While at anchor in the stream of Stono river, a navigable salt-water river, on 13th September last, his dredge was run into by a raft floating down the stream with the tide, and injured. He brings this libel *in rem*. An exception is taken to the jurisdiction. Will a libel *in rem* lie against a raft for collision on navigable waters? The precise question has not been decided in any case reported. Chief Justice TANEY, in *Tome v. Four Cribs of Lumber*, Taney, 533, was of the opinion that rafts anchored in a stream, although it be a public, navigable river, are not the subject-matter of admiralty jurisdiction, when the right of property or possession alone is concerned. In that case he refused to allow salvage for saving rafts. But his decision went off on the custom of the Chesapeake. See *Fifty Thousand Feet of Timber*, 2 Low. 64. In *Jones v. The Coal Barges*, 3 Wall. Jr. 53, — a libel for collision, — Justice GRIER held, with respect to coal-barges: "Mere open chests or boxes of small com-

parative value, which are floated by the stream, and sold for lumber at the end of their voyage. A remedy *in rem* against such a vessel, either for its contracts or its torts, would not only be worthless, but ridiculous; and the application of the maritime law to the cargo and hands employed to navigate her would be equally so. * * * Every mode of remedy and doctrine of the maritime law affecting ships and mariners may be justly applied to ships and steamboats, but could have no application whatever to rafts and flat-boats." Since this decision, however, other judges have had wider views of the jurisdiction of admiralty. In *The General Cass*, 1 Brown, Adm. 334, a scow—a mere float or lighter—was held to come within the jurisdiction of the court. In *The Pioneer*, 30 Fed. Rep. 206, a steam-dredge was held subject to a maritime lien for supplies. In *Disbrow* v. *The Walsh Bros.*, 36 Fed. Rep. 607, a barge without sails or rudder, used for transporting brick, on which men are employed for loading, carrying, and delivering brick, is held subject to a lien for wages of the men in this service. In *The Hezekiah Baldwin*, a canal-boat used as a floating elevator, having no motive power of its own, or capacity for cargo, is held maritime property. 8 Ben. 556. In this circuit, Judge Bond held that flats on which machinery for digging phosphate in navigable streams, and the lighters attached to them, were vessels, and that the hands employed on them had a lien for wages, and material-men a lien for supplies. *Miller & Kelly* v. *Dredges*, MS. Circuit Court S. C. 1884.[1] So, also, with respect to salvage, other judges entertain different views from the late chief justice. In *Fifty Thousand Feet of Timber*, 2 Low. 64, Judge Lowell held that a salvage service is performed when a raft of lumber is saved from peril on navigable waters, and that a claim for such service may be made in a court of admiralty. He quotes Judge Betts, *A Raft of Spars*, 1 Abb. Adm. 485. Judge Pardee, in *Muntz* v. *A Raft of Timber*, 15 Fed. Rep. 555–557, held that a raft of timber is subject to the jurisdiction of the admiralty court in the matter of salvage; reserving, however, the question whether it can commit a maritime tort. In *Gastrel* v. *A Cypress Raft*, 2 Woods, 213, it was held that admiralty has not jurisdiction to try title to logs because they have been formed into a raft; but on examination of that case it will be seen that the raft was made up of logs cut on a piece of land, the title to which was in dispute, and that the libel was filed in order to determine the title to this land. The logs were in New Orleans, their navigation was over, and they were really nothing but a pile of timber. The cases are collected and commented upon in *The F. & P. M. No. 2*, 33 Fed. Rep. 512. The result is that, while there have been *obiter dicta* on the point, there is no direct decision. Such being the state of the authorities, we can safely proceed on general principles.

That a raft is a water-craft distinctly appears in section 4233, Rev. St. rule 12: "Coal-boats, trading-boats, rafts, or other water-craft." In *U. S.* v. *One Raft of Timber*, 13 Fed. Rep. 796, Judge Bond held that a raft was a vessel, under sections 4233, 4234, and must carry lights.

---

[1] No opinion.

"The true criterion by which to determine whether any water-craft or vessel is subject to admiralty jurisdiction is the business or employment for which it is intended, or is susceptible of being used, or in which it is actually engaged, rather than its size, form, capacity, or means of propulsion." *The General Cass*, 1 Brown, Adm. 334. The raft in this case was of cross-ties, and was used as the cheapest and most convenient mode of bringing them to market. It was made up of several small rafts, 36 in number, technically known as "bulls." Each bull was made up of cross-ties, three or four deep, securely and compactly joined together, and fastened in a crib, so as to be immovable; and then all the bulls were united by fastenings, making one body,—the raft,—in the shape most suited for navigating the streams which it must pass. It was manned with a pilot, who was in command, a crew of four men, and a cook. The pilot and crew, during the voyage,—many days in duration,—lived on the raft, on which was constructed a small shelter. The raft had come from the Edisto river, and, pursuing its way towards the sea, had used the many navigable streams forming the inland navigation of this coast. Necessarily, it was constructed to withstand the buffeting of the waves and winds, and the strain of passing over shallow places. Its locomotion depended almost altogether upon the tides; but poles and large oars, known as "sweeps" were used constantly, as well in the propulsion of as in giving direction to, the raft. Rafts like this are in constant use. Sometimes they bring down only the timber or lumber which forms the raft; at others, cargo in the shape of cross-ties or fire-wood is brought. Their proper navigation requires vigilance, experience, and skill. Courts of admiralty have jurisdiction *in rem* in cases of collision between vessels on navigable waters. "The word 'vessel' includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation by water." Rev. St. § 3. "*Navigium*"—vessel—is a general word used for any kind of navigation. Ben. Adm. §§ 216, 218. The first vessels were rafts. The raft is the parent of the modern ship. Encyclopædia Britannica, art. "Ship." "A maritime lien can only exist upon movable things engaged in navigation, or upon things which are the subjects of commerce on the high seas or navigable waters. It may arise with reference to vessels, steamers, and rafts, and upon goods and merchandise carried by them." Per FIELD, J., *The Rock Island Bridge*, 6 Wall. 213. In my opinion, this raft fulfills the definition of the subject of maritime lien, and the libel will lie.

### ON THE MERITS.

The dredge was a quadrangular flat, 20 feet wide by 60 feet long. On one side of her was a flat or lighter 40 feet long and 14 feet beam; on the other side, a smaller lighter ——— feet long and ——— feet beam. She was lying in Stono river, between Rantowles creek and Wappoo cut, the highway over which all rafts from the Edisto river to Charleston must pass. She was in the channel. At that point the river is at its greatest width, estimated by some witnesses at half a mile, by others

500 yards, and certainly not less than 1,000 feet. Her exact location was two-fifths of the width of the channel from the south shore. The channel of this river extends from shore to shore, of the uniform medium depth of 8 feet, gradually shoaling as it reaches the shore. Poles can be used anywhere about this place in navigating a raft. The dredge was at anchor fore and aft with the stream. She had out a double anchor and chain at the end looking up the stream, styled her "stern;" one anchor with chain cable on each side; and two anchors with chain cables out at the forward ends, styled the "bow." She had on her two lights. One of these was a bright white light, in a round lantern, about 12 feet from her deck. On the night of the collision, 13th September last, and at the time, there were on the dredge two hands,—one a colored boy, apparently 20 years of age, who was called the "watchman," and another, a deck hand. Stono river, between the two creeks indicated, has in it several bends. At the place where the dredge was lying, there is a straight reach of about half a mile, running east and west from the bend above. The current of the river flows down this reach in a direction east, a little south. The raft on 12th September, the day preceding the collision, had reached the mouth of Rantowles creek as it enters the Stono. There it awaited the ebb-tide. High water was between 11 and 12 o'clock midnight. Taking the first of the ebb, the raft floated down the Stono. Her pilot, who had large experience, and who was on the lookout, saw the lights on the dredge in her position, 2½ miles below Rantowles. He had never seen a vessel at anchor at that place. He came to the conclusion that the lights were on a vessel in motion. He did not discover that she was at anchor until he got within 150 yards of her, and then he began to take his precautions. At that moment he was about 25 yards from a small wharf or landing on the south shore. All hands having been called, they put out their poles, and tried to get the raft out of the way of the dredge. They succeeded in getting her towards the opposite bank, where one end of the raft took the bottom. Thereupon the current swung the other end around, and, as she passed the dredge, a raft of timber which, a day or two before, the pilot had permitted to be lashed to the one side of his raft, caught the chains of the stern anchor of the dredge, and held it fast, dragging the dredge some 50 yards. After some effort, the chain was dislodged from the timber, and the raft went on its course alone. The dredge floated a a short distance further, and lodged on a bank. There is no evidence that there are any shore or range lights on Stono river near this place.

There is much conflict in the testimony upon one or two matters: Whether the raft had a light; whether her crew were asleep; whether the men on the dredge were awake. The raft, without doubt, had the large fire built on it which all rafts carry in the rivers. She had no regulation light. As the dredge had out 6 anchors, with no means of locomotion, it would not have been possible to move her so as to avoid collision if every hand she had was awake. Whenever there is a collision between a vessel at anchor and one in motion, if it appear that the

vessel at anchor is without fault, the vessel in motion must exonerate herself from blame by showing that it was not in her power to prevent the collision by adopting every practicable precaution. *The Clarita*, 23 Wall. 1; *The Virginia Ehrman*, 97 U. S. 315. The dredge was in the channel, two-fifths of its width from the south shore. If the channel was only 600 feet wide, this left 240 feet on the south, and 360 feet on the north, of her as a passage. If it was 1,000 feet wide,—and this is less than the weight of evidence fixes,—there would be 400 feet on the south of her, and 600 on the north of her, less the width of herself and her flats. Respondents say the raft was 150 feet square. It consisted of 36 bulls, and, being square, there must have been 6 bulls on each side. Each bull consisted of two lengths of cross-ties. A cross-tie is 8 feet long; that is to say, each bull was 16 feet wide. Each side of the raft was 96 feet, and, allowing for spaces, call it 100 feet. So there was not such an obstruction of the channel as prevented the passage of the raft. The dredge had up the light required by law, and, as there are no range lights or shore lights on the Stono at this point, there was no excuse for not understanding them. So the dredge was not in default. *The Virginia Ehrman, supra; The Milligan*, 12 Fed. Rep. 338. "A vessel at anchor in a proper place, with a proper signal light, and with one of her crew on deck, is sufficiently lighted and watched." *The Clarita*, 23 Wall. 1.

Was the accident inevitable? The pilot of the raft had a long and large experience, and is an intelligent man. He saw the lights of the dredge long before he reached her. He was sure that they were on a vessel in motion, because he had never seen a vessel at anchor in that place before this. But the sailing regulations designed to prevent collisions are precise and clear. Section 4233. All vessels in motion but pilot-boats must carry colored lights. Pilots carry white lights, but must exhibit a flare-up every 15 minutes. Rules, 3, 8, 11. Vessels at anchor carry a white light, like the one on the dredge; and this light told the pilot that she was at anchor. The fact that he had never seen a vessel at anchor just there should have stimulated his curiosity and care. He took no precaution, because he was under misapprehension until he got within 150 yards. He then showed his skill, and proved that he had his raft under control. Going promptly to work, he nearly escaped collision; indeed, but for the timber raft accidentally with him, he would have escaped the collision. It is probable that if the pilot had not disregarded the lights, and had taken his precautions when he saw them, the raft would have passed the dredge safely. It is not improbable that, skilled in the management of his own raft, the pilot would at all events have passed safely if he had not perhaps forgotten, or perhaps had not miscalculated, the timber raft attached to him. Be this as it may, the misreading the lights was negligence, forbidding the idea of inevitable accident. *The Clarita, supra*. The burden being on the pilot to exonerate himself, this fact operates against him. I find that the raft was in default.

## DAMAGES.

The remaining question is that of the damages. These must be such as will furnish complete indemnification to the libelant for his loss. *The Atlas*, 93 U. S. 302. The items which enter into the estimate of damages are the actual cost of repairs, compensation for the loss of time within which the repairs should have been made, the reimbursement for the expenses incurred in saving property, and thus reducing the amount of the loss. *The Fannie Tuthill*, 17 Fed. Rep. 87; *The Venus*, Id. 925; *Vantine* v. *The Lake*, 2 Wall. Jr. 52. These damages must not be the result of conjecture; they must be actual. There is no room in this case for punitive damages. The evidence for the libelant, on these points, consists simply of his statement. No receipts nor memoranda nor items are produced. He testifies that so much money was paid for searching for the anchors, the collision having torn the dredge from its moorings; that so much money was expended for beaching the dredge and repairing it; that the loss of service of the dredge was 9 working days, with an average of 9 tons of phosphate rock per day. There is nothing before the court which can enable it to test the reasonableness or the accuracy of these statements and estimates. More light is needed on these points, and I will refer the matter. The libelant actually ceased work for 15 days. Four of these days were consumed in consultation with his attorney, and in deciding on his course. The restitution and repairs were made during the 10 days subsequent. He can only charge for these 10 days, or for so many of them as were actually required for the restitution and repairs. He charges certain items of personal expense. If his presence contributed to the work, and was necessary for this purpose, that is a proper charge. If, however, he visited the place simply to see how the work progressed, it is not a proper charge. Let the case be referred to C. R. Miles, Esq., to inquire and report such evidence as will state in detail the items of damage, and the reasonable time and money expended in repairing the same.