### ROSS v. CORNELL STEAMBOAT CO.

(District Court, D. New Jersey. January 29, 1906.)

COLLISION—TUG WITH TOW AND ANCHORED DREDGE—MUTUAL FAULT.

A tug coming down the Hudson river at night with a heavy tow consisting of a number of loaded scows tandem, the whole extending a quarter of a mile in length, *held* in fault for a collision between her tow and a steam dredge engaged on government work and anchored on the side of the channel where she had been at work during the day, the evidence showing that the tug knew the position of the dredge, and had a tow so large and unwieldy that she could not properly handle it with the strong ebb tide which was running. *Held,* also, that the dredge was in fault for remaining at night where she did in the channel at a place where, by reason of a bend, it was difficult for vessels with long tows to pass in safety.

[Ed. Note.—For cases in point, see vol. 10, Cent Dig. Collision, §§ 87, 88½, 200.]

On Libel, etc.

Bedle, Edwards & Thompson, for libelant.

Amos Van Etten, for respondent.

CROSS, District Judge. The libel in this action is filed to recover damages to steam dredge No. 2, belonging to libelant, which resulted

from a collision between it and a tow in charge of the tug Norwich belonging to the respondent. The accident happened on the 19th of May, 1897, at about 11 o'clock in the evening, at a place known as "Mull's Rock," in the Hudson river between Coxackie and the state dam at Troy. The libelant had a contract with the United States government for the removal of sand and rock which obstructed navigation at the place above mentioned. He had been engaged in the work for three years prior to the year when the accident happened. Work for the year 1897 was commenced about the 1st of April and continued to the time of the accident, at which time the work was nearly completed; some cleaning up of sand and broken rock only remained to be done. At the time of the collision the dredge was anchored at the upper corner of Mull's Rock, and about 150 feet westerly of the center of the channel at that point. There was a scow moored to the starboard side of the dredge. The condition of the channel at the time of the collision was such that vessels would at times slow up and go down to the west of the dredge, but the old channel to the eastward was the one in general use. The channel previous to the work done at Mull's Rock, was such that boats coming down the river were compelled to cross it three times within a comparatively short distance, or to speak more definitely, the channel ran from Castleton Light on the east side of the river along what is known as the "Nine Mile Cross-Over," to a point on the westerly shore where there is a light known as the "Upper Beacon," and from thence along the westerly shore until near a light known as the "Lower Beacon" above Mull's Rock, and thence through what is known as "Mull's Cross-Over," towards Mull's light, after which it turns again toward the westerly shore in the direction of Coeyman's. The channel on the east side of Mull's Rock was from 250 to 300 feet in width. The dredge of the libelant had been accustomed to remain anchored at the place where she quit work, and was on the night of the collision thus anchored by three spuds with an anchor line at her bow and stern. The attendant scow which was by her side nearest Mull's Rock, was uninjured. By the contract with the government, it was provided that the work should "begin in the lower river and continue up stream to completion, as the engineer in charge may direct. * * * The work will be carried on under the direction of the engineer in charge. The orders of the assistant engineer or his agent will be strictly obeyed. Inspectors will be appointed for each locality who will remain constantly with the plant while at work." This is the only portion of the contract which bears upon the question at issue.

On the night of the collision the Norwich was coming down the river in charge of a tow consisting of about 10 or 12 mud scows, heavily loaded. The Norwich was attached to the head scow by a hawser 25 fathoms in length, and the scows were hitched tandem, and as close to each other as was possible. The Norwich was 170 feet in length and the scows were approximately 100 feet in length. There is some diversity in the evidence as to the number of scows in the tow, but accepting the smaller number as correct, and including the length of the Norwich, the hawser connecting her with

the head scow and the length of the scows, it is obvious that the entire length of the Norwich and her tow was about a quarter of a mile, and the captain of the Norwich says that it was one of the heaviest tows that they took. The tide rises and falls at this point of the river about $2^7/_{10}$ feet, and it was running strongly ebb at the time of the accident. The scows drew when loaded, from 7 to 13 feet of water, and at low water would have had great difficulty in passing through the channel by Mull's Rock. The river and weather conditions were normal; there was no freshet in the river and the night was clear. At the time when the collision occurred, the dredge was showing a white light upon a staff at least 20 feet above the deck, and a red light exposed on her side toward the channel, and there was the usual watch on deck; another red light was shown on the inshore or westward side of the scow accompanying her. The red lights were seen plainly by several witnesses who were on the Norwich, about three-quarters of a mile above the point where the dredge was anchored. Two or three of these witnesses, however, say they did not see the white light, but the pilot of the Norwich admits that he saw it, and the watch on the dredge, whose duty it was to put up the light nightly, says that it was up and burning, and that it remained burning until the next morning, when he took it down. The evidence satisfies me that the white light was burning in its proper place, and there is no doubt whatever, that the red lights were both shown and seen, as above stated. When the red lights were seen by those on board the Norwich, she gave several sharp whistles, but continued her course, and, in rounding Mull's Rock, kept as far to the eastward, according to the testimony, as the depth of the water would permit. The dredge was, however, struck twice by scows at or near the rear end of the tow; a hole four feet square was knocked in her stern on the port corner, from the effects of which she sank in about five minutes. Her staff with the white light on it remained above water.

The libelant claims that the collision was caused by the unskillful and negligent manner in which the tow was made up and navigated by the tug Norwich, and also because the tug had no proper control over her tow. The respondent on the other hand denies this, and claims that it was the duty of the libelant to remove the dredge at night when it was not working, since it was so near the channel as to be dangerous to navigation; it further claims that notice had been given by the captain of the Norwich to the captain of the dredge, on the morning of the day of the collision, when the Norwich was going up the river, that she was coming down that night with a heavy tow, and that the dredge must be taken out of the way. In response to this, the libelant says that it received no such notice, that the work was government work which was being hurried, and that to remove the dredge at night would have caused delay in resuming the work in the morning, at the exact location where it had stopped the night before, since such location had to be determined by means of ranges, some of which were about 2,500 feet distant, and that under the circumstances he was justified in anchoring for the night where he did. Fur-

thermore, he claims that he was authorized to anchor there, by a letter written to him by the government engineer in charge of the work, dated July 6, 1896, in which the engineer, after referring to complaints that had come to his office as to the position of libelant's anchors and buoys at night, says:

"There is no necessity for obstructing the channel at night either with engines, or buoys, or anchors. Of course, it might make the work a little more expensive to move your machines and anchors at night, but that is only a contingent of the work, and will have to be borne. You will therefore please instruct your superintendent that all machines and anchors, and buoys, unless lighted, must be removed to one side of the channel at night; or more accurately when no work is being done. This is not required to humor the whims of pilots, but to comply with the laws in regard to obstructions to navigation."

The rule of law applicable to the case of a moving vessel with respect to one properly anchored, is laid down in the case of The Virginia Ehrman, 97 U. S. 309, 315, 24 L. Ed. 890, and is as follows:

"Vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame by showing that it was not in her power to prevent the collision by adopting any practicable precautions. Citing cases.

See, also, The Scotia (D. C.) 10 Fed. 684; Seabrook v. Raft of Railroad Cross Ties (D. C.) 40 Fed. 596; The Nettie Sundberg (D. C.) 100 Fed. 886; Merchants & Miners Transportation Co. v. New England Dredging Co., 76 Fed. 877, 22 C. C. A. 597.

Whether the libelant was at fault in anchoring the dredge where he did, will be considered after the question of the respondent's negligence has been dealt with. It will be remembered that the dredge was anchored on the upper and port corner of Mull's Rock, at a place immediately adjacent to and parallel with the main channel of the river; that proper lights were maintained on the dredge which were seen by those in charge of the Norwich and her tow when they were about three-quarters of a mile away. There was also a watch on the deck. The dredge was anchored, and at the time was helpless. All that the pilot of the Norwich did, or pretends to have done, when the lights on the dredge were discovered, was to blow her whistle. She had under her charge one of the heaviest of tows, and while the testimony shows that it was not customary to have a tender accompany a tow, nevertheless, as a matter of fact, the Norwich had one, the Dixon, that night, but it was not used to either warn the watch on the dredge of the approaching tow, or to aid in preventing the collision. The tender had passed down the river just ahead of the Norwich, for the purpose of picking up two scows at some point less than a mile down the river, and consequently was not available to ward off the rear end of the tow, and keep it from colliding with the dredge, nor was it used, as it apparently might have been, to notify the watch on the dredge in passing, that a heavy tow was immediately following, which would endanger the dredge. Had this been done, the crew of the dredge might have gotten up steam and moved the dredge, or taken

other measures to protect it. But aside from this, it seems clear that the tow was too long and heavy to be safely managed and controlled by the Norwich at this point, with the tide at ebb. The Norwich was an old side-wheeled steamer, and had been used for towing upwards of 23 years; she had an engine of a little over 700 horse power, and Captain Du Bois says of his tow, that:

"It was a heavy tow drawing a big draught of water, and will tow along all right as long as you have water enough; that it was the heaviest tow they take down."

And Hayes, who was the first pilot of the Norwich, on the night in question, when asked to describe the course that the boat took the night of the collision, in reply thereto, and after speaking of crossing from one side of the river to the other, adds:

"In the meantime at the Cross-Over at this point, this dredge lay. It was at ebb tide, and towing so the tide carried the tow faster than I could pull it clear of the dredge, and swung it against the dredge which lay on the point of the Cross-Over."

From which it would appear that the condition of the river being, as it was normal, the respondent had a heavier tow than the Norwich could manage. There were no conditions existing which a skillful pilot and master could not, and ought not to have foreseen. They knew the dredge was working there, the depth and width of the channel, draught of the scows, the condition of the tide, and the length and character of the tows. Again, the testimony shows that the pilot of the Norwich steered his vessel diagonally across the river, and as far over toward the eastward shore as the depth of water in the channel would permit. This necessarily tended to expose the port side of the long and heavy tow to the full force of the ebb tide. Upon this point Captain Pratt, a witness for the respondent, who had been engaged in navigation on the Hudson river for 53 years, was asked this question:

"Q. The testimony of the captain of the Norwich was that he kept as close to the dyke on the east side of the river as he could get, without going on the rocks; wouldn't that have a tendency to throw the tail end of his scow, the tail scow, over on the rocks? (Mull's Rock). A. I should say it would, if he done that."

There is no explanation of this testimony, and in the absence of any, it would seem to raise a serious question as to whether the Norwich was properly navigated, as it is obvious that the more nearly the tow was kept in line with the channel and current, the less opportunity would the tide have to act against the broadside of the tow, and bear it down upon the dredge. In addition to this, Captain Du Bois, of the Norwich, referring to the men operating the dredge, says, that "when they were working on the rock, they were right where we had no business to go." This testimony is important, for the reason that the weight of the evidence shows that the dredge at the time she was struck and sunk, was on the point of Mull's Rock, where she had been working. The respondent claims however, in justification of its taking this long and heavy tow down the river that night, that the captain of the Norwich notified the captain of the libelant's dredge on his way up the river, that he was coming down with a heavy tow that night, and that he must remove his dredge. The evidence how-

ever, does not satisfy me that such a notice was given, or rather does not satisfy me that it was understood by any one on board the dredge. It is not claimed that any reply was made, except some of the witnesses say, that a person whom they supposed was the captain (he is now dead) threw up his hands and laughed; but he would naturally have done this in answer to any salutation from those on board of a passing vessel whether he understood what was said or not. When we consider that the Norwich was a side-wheeled steamer, and was passing at some distance from the dredge, that no megaphone or trumpet was used, and that no stop was made by the Norwich, or any verbal answer received, it would be altogether unreasonable to hold that the notice, if given, was understood. If the respondent intended to rely upon any such notice it should have made sure that it was understood.

The testimony shows that this dredge was accustomed to lie at night over the rock at the place where it quit work. An attempt was made by the respondent to show that other dredges at different points on the river were accustomed to draw off from their places of work at night, and anchor outside of the channel; it is sufficient to say in answer that no general custom of that character was proved. Under the evidence I think the Norwich and her tow were negligently managed and controlled on the night in question; but I also think that the dredge was improperly anchored, and that the libelant must be charged with partial responsibility for the accident. It already appears that the dredge was anchored at the upper and port corner of Mull's Rock, at a point immediately adjacent to the main channel of the river. Mr. Van Winkle, who was in charge of the work for the libelant, in his testimony, when referring to tows coming down the river, says:

"That sometimes they would come pretty close to us, sometimes they would rub against us with a heavy tow dragging the bottom, and that sometimes they would run pretty close to us; if they were light, they had plenty of water."

I find nothing in the case which made it impossible for the captain of the dredge to have anchored elsewhere than he did. As already stated, the work was nearly completed, and the water under the dredge where it was anchored, was at this time practically of the same depth that it was in the channel. It was clearly careless under the circumstances, to anchor the dredge at the upper corner of the rock at Mull's Cross-Over, where navigation under the best conditions, even by craft not unwieldy, was more or less hazardous. Since the happening of this collision, the act of March 3, 1899, c. 425, § 15, 30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543] has been passed which provides:

"That it shall be unlawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct passage of other vessels or craft."

The statute just referred to, does not apply to this case, nevertheless, in City of Birmingham, 138 Fed. 555, the Circuit Court of Appeals for the Second Circuit, held at page 560, upon an application for a rehearing, that irrespective of the statute, "the dredge was in fault in anchoring where she did at night, when there was nothing to

prevent her from removing to a position where it would have been impossible for steamers to have reached her." The Milligan (D. C.) 12 Fed. 338; The Clarita, 90 U. S. 1, 14, 23 L. Ed. 146. The channel turned just at the point where the dredge was anchored, and was only from 250 to 300 feet wide; considering these facts, I think the dredge should have been anchored in a more secure place. The government engineer evidently thought so, and I find nothing in his letter which excuses the libelant. There was some dispute between counsel on the argument as to the construction of the letter but adopting any possible construction, it did not warrant, and cannot be held to warrant, the libelant in adopting an unsafe anchorage. This responsibility rested upon him, and the substantial direction of the letter was that the libelant should withdraw its dredge and apparatus at night, notwithstanding any trouble or expense involved, and since he did not do so, he must be held to have assumed the risk of adopting another course.

No controversy has been made over the damages and demurrage proved; they amount to $2,954.68. As I find both parties at fault, a decree will be entered in favor of the libelant, for one-half of the above amount, with interest from September 1, 1897, together with one-half of the costs.