**UNITED STATES of America,**
**Libelant,**

v.

**THE M/V MARTIN, her engines, tackle, apparel and furniture, and THE Barge MOS–101, her engines, tackle, apparel and furniture, Respondents.**

**MARTIN OIL SERVICE, INC., a corporation, Cross-Libelant,**

v.

**UNITED STATES of America,**
**Cross-Respondent.**

**No. P–2029.**

United States District Court
S. D. Illinois, N. D.

Oct. 12, 1961.

Harlington Wood, Jr., U. S. Atty., Springfield, Ill., Anthony W. Gross, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for libelant and cross-respondent.

William K. Johnson, Lord, Bissell & Brook, Chicago, Ill., Clifford C. Johnson, Heyl, Royster & Voelker, Peoria, Ill., for respondents and cross-libelant.

MERCER, Chief Judge.

The United States of America, hereinafter referred to as libelant, filed this libel in two counts against the respondents, M/V Martin and Barge MOS–101, for damages arising out of the alleged collision of the vessels with an Illinois River navigation beacon structure known as Drolls Point Light. Martin Oil Service, Inc., owner of the respondent vessels, filed a cross-libel for damages allegedly sustained by it as a result of the same incident.

The cause came on for trial without a jury and was taken for decision upon the evidence, after arguments of counsel had been heard and briefs of the respective parties had been submitted to the court. After due deliberation, the court enters its findings of fact and conclusions of law, as follows:

### Findings of Fact

1. The M/V Martin is a steel motor vessel, Official Number 260333, of 183 gross tons, 93.8 feet in length, 26 feet in width and 7.4 feet in depth. On April 19, 1956, the vessel was owned and operated by cross-libelant, Martin Oil Service, Inc.

2. The Barge MOS–101 is a steel tank barge, Official Number 262739, of 1,321 gross tons, 289.5 feet in length, 50.3 feet in width and 9.3 feet in depth. The Barge MOS–103 has characteristics similar to those of the MOS–101.

3. The Illinois River, an affluent of the Mississippi River, is a part of the Illinois waterway which connects the Great Lakes with the Mississippi River system and the Gulf of Mexico. The River is navigable throughout its length.

4. On April 19, 1956, and at all times material hereto, libelant, acting through the United States Coast Guard, owned and maintained various aids to navigation defining the navigable channel of the Illinois River. One such navigation aid then maintained by libelant was Drolls Point Light, which was located at the westernmost boundary of the channel at Mile 168.9 in a portion of the River known as Peoria Lake. Drolls was located about 200 feet west of the sailing line established by official charts for navigation of Peoria Lake.

5. The lighting mechanisms of Drolls Point Light, consisting of two 3-degree, flashing, green lights, oriented, respectively, upstream and downstream, and one 360-degree, flashing, green light, was positioned atop a 17-foot tower rising above the surface of the River upon a concrete base or cap. The tower of Drolls was equipped with scotchlite re-flectors which reflected light thrown by the beam of searchlights from distances up to at least 5 miles, and which were positioned on three of its four sides, i. e., the sides facing upstream, downstream and toward the River channel.

6. On April 19, 1959, the relevant section of the channel of Peoria Lake was fully and adequately marked by both lighted and unlighted navigational aids. From Mile 171 therein, southward, to Mile 165, there were four lighted aids installed and maintained by libelant, to wit: Detweiller Park Light, situated west of the sailing line at Mile 170.9; Drolls Point Light, also west of the sailing line; Ivy Club Lighted Buoy, situated west of the sailing line at Mile 167.9; and Avery Light, situated east of the sailing line at Mile 165.3. In addition to those lighted aids, range lights were affixed, oriented upstream, upon the State highway bridge which crosses Peoria Lake at Mile 165.7. The westerly limits of the channel were also marked by black, cone-shaped, unlighted buoys, while the easterly limits thereof were marked with similar red buoys. One of the latter was situated directly opposite Drolls Light, about 200 feet to the east of the sailing line.

On the last mentioned date, all lighted and unlighted aids to navigation were situated in their known and proper locations.

7. Southbound vessels make a port turn at Detweiller Light, where the River bends sharply to the left. From immediately south of Detweiller Light to a point south of the State highway bridge the sailing line is virtually a straight line and it extends in a south-southeasterly direction. After completing the turn at Detweiller Light, an experienced navigator can keep his downbound vessel on the sailing line in mid-channel by keeping her bow on the range lights on the State highway bridge and her stern on Detweiller Light without using any other aids to navigation. By maintaining such a course his vessel would pass approximately 200 feet to the east of Drolls Light.

8. Shortly prior to 3:55 a. m., on April 19, 1956, the Martin, downbound from Blue Island, Illinois, to West Memphis, Arkansas, entered Peoria Lake. She was then pushing the unladen, unmanned Barge MOS–101 as the starboard unit of an abreast, two-barge tow. The second unit was the Barge MOS–103 which was also empty and unmanned.

The Martin was manned by a master, a pilot and seven crew members. Prior to the entry of the Martin into Peoria Lake, the master was relieved by the pilot, John E. Haney. At all material times, Haney, a deckhand, and an engineer were the only members of the crew on duty. Haney was in sole charge of the navigation of the vessel and her tow. The engineer remained in the Martin's engine room, and the deckhand was engaged in general duties. The master and all other crew members were off duty and remained below deck. No lookout was maintained on the Martin's tow or on the Martin herself, except from her pilot house.

9. At about 3:55 a. m., on April 19, 1956, the Barge MOS–101, in tow of the Martin, collided with Drolls Point Light. From midnight until the time of collision, the weather was dark but clear, with some slight haze over the water. Visibility was good.

10. Two other towing vessels were in Peoria Lake at the time of the collision of the Martin and her tow with the Light, namely, the Bruce Walker (since renamed the Agnes S) and the Gerow. At that time, the Gerow was upbound about two miles south of Drolls Light, while the Walker was downbound in the vicinity of the bend in the River near Detweiller Light.

11. The force of the collision broke the Barge MOS–103 loose from the tow. By virtue of a radio warning to the pilot of the Gerow, the Gerow was able to take the loose barge into tow and return it to the Martin. When the Gerow arrived at the scene of the collision, the bow of the Barge MOS–101 was caught fast on the cap of Drolls Light. Efforts of the Gerow, working in tandem with the Martin, to dislodge the barge from the Light cap proved fruitless, and the Gerow left the scene of the collision at about 6:30 a. m.

12. Upon conflicting evidence I find that the collision between the barge in tow of the Martin and Drolls Light proximately resulted from the negligence of the owners of the respondent vessels, and their agents, to wit:

a. In committing the sole responsibility for the navigation of the Martin through Peoria Lake to a pilot who was unfamiliar with the waters and inexperienced in navigation through them;

b. In that the pilot, to whom navigation of the vessel was entrusted, failed to ascertain his course and position relative to the position of fixed navigational aids;

c. In that the pilot to whom navigation of the vessel was entrusted, negligently proceeded at a rate of speed not consistent with able seamanship in view of the fact that he had failed to ascertain the course and position of the vessel relative to the position of fixed navigational aids including Drolls Point Light; and,

d. In that the pilot to whom navigation of the Martin was entrusted, failed to use his searchlights and means at his disposal for adequate lookout and, thereby, failed to determine the course of the vessel and her position relative to the known and fixed position of Drolls Point Light.

Libelant requests the court to find negligence from the fact that Haney was not licensed by the Coast Guard as a pilot and from the fact that no lookout was posted upon the Martin or her tow in addition to that maintained from the pilot house of the Martin. Although the asserted facts are proved by a preponderance of the evidence, negligence will not be imputed from the absence of the license or from failure to maintain additional lookouts from the vessel and from the bow of the tow in view of the weather conditions then prevailing. I find the lookout from the pilot house of the vessel adequate had the lookout from

that point been properly maintained under the weather conditions then existing, but I also find that there was culpable neglect on the part of the officer of the Martin in his failure to employ the opportunity for adequate lookout open to him.

13. I find, upon conflicting evidence, that Drolls Point Light was lighted and operating properly immediately prior to and at the time of the collision. Of the witnesses who testified that the light was not lighted, Haney admitted that he did not see the Light prior to the collision and that, from a sighting of a red buoy some distance above the location of Drolls, he had assumed his position in the channel to be some 200 feet east of the Light, the deckhand on duty on the Martin was engaged in routine duties and had no responsibility for the navigation of the vessel or to observe navigation aids and the pilot of the Walker had no occasion to look for Drolls prior to the collision inasmuch as his vessel either had not reached the bend in the River at Detweiler Light or was in the process of negotiating the bend when the collision occurred.

Opposed to that testimony is the testimony of the pilot of the upbound Gerow that he had used Drolls just prior to the collision in navigating through the "narrows" between Mile 166 and Mile 166.8 of the River. Maintenance personnel had checked Drolls on the evening prior to the collision and had observed all lights burning and functioning properly. Drolls had been periodically checked by the Coast Guard and maintained in good operating condition. No complaint had been received by the Coast Guard between March 26, 1956, until after the collision on April 19, 1956, of any failure or malfunction of Drolls. Following a report on March 25, 1956, that the Light was not operating, a Coast Guard lamplighter had checked the Light and found it operating properly, but had changed the flasher mechanism "to be sure", and had inspected all other mechanisms of the Light. In two radio conversations just prior to the collision, the first between the pilot of the Martin and the

pilot of the Walker and the second between the pilot of the Martin and the pilot of the Gerow, no mention was made of Drolls being out or not functioning properly. I find it incredible that the pilot of the Martin, armed with knowledge that Drolls was not lighted, would have arranged for his vessel to meet the upbound Gerow in the channel without warning the pilot of the Gerow that Drolls was not lighted.

The testimony for libelant is the more credible and preponderates in favor of a finding that Drolls was lighted and was functioning properly immediately prior to and at the time of the collision.

14. I find from a preponderance of the evidence that Drolls Point Light was in an undamaged condition immediately prior to the collision, and that the Barge MOS–101, in tow of the Martin, collided with and knocked down the light stand.

15. Libelant, acting through the Coast Guard, used due care to make certain that Drolls Point Light was maintained in good operating condition. There is no evidence of any negligence on the part of any of libelant's employees in maintaining the Light.

16. The collision complained of in the libel and cross-libel was not contributed to by any act or neglect of libelant's employees, but proximately resulted from the negligence and fault of the respondent vessels, their owners and their agents.

17. Drolls Point Light was built by libelant in 1939. The cap or mound of the Light was composed of approximately 31.3 cubic yards of concrete, reinforced with 2 tons of steel. The light tower, rising 17 feet above the cap, was composed of approximately 11 cubic yards of concrete and 2 tons of steel. The tower was connected to the cap by 40 reinforcing rods, each having a cross-sectional area of .44 square inches and a tensile strength of 20,000 pounds to the square inch.

The light mechanism, situated atop the tower, consisted of two 3-degree directional lights, one oriented downstream

and the other oriented upstream, and one 360-degree light which was visible from all directions. All lights were flashing green lights, operated automatically and powered by batteries. The 360-degree light was equipped with an automatic bulb changer, activated by extinguishment of the bulb in use, which achieved the replacement of an extinguished bulb in about 40 seconds time. The bulbs in the fixed directional lights which required manual replacement were longer-lifed bulbs than that used in the 360-degree light. All light bulbs, lighting mechanism and batteries were fully protected against water, wind and vibration.

Each of the lights atop Drolls tower was visible, even in hazy weather, from a distance of at least 3 miles.

■ 18. As a proximate result of the collision, libelant was compelled to rebuild Drolls Point Light and to prepare and maintain a temporary navigation aid until the rebuilding was completed, whereby libelant incurred reasonable costs and expenses in the amount of $12,-186.99.

19. Libelant has proved its libel, and each count thereof, and is entitled to judgment in its favor against each of the respondent vessels for its reasonable costs and expenses occasioned by the damage to the Light and for statutory penalties.

20. Cross-libelant, Martin Oil Service, Inc., has failed to prove its claimed right of action against libelant by a preponderance of the evidence.

### Conclusions of Law

1. This court has jurisdiction of the action, and venue is properly laid in the Southern District of Illinois.

■ 2. Colliding with a stationary light tower, properly charted and at its known location, in itself raises a presumption of negligence and fault. The Virginia Erhman, 97 U.S. 309, 315, 24 L.Ed. 890; Inland & Seaboard Coasting Co. v. Tolson, 139 U.S. 551, 554–555, 11 S.Ct. 653, 35 L.Ed. 270; The Cromwell, 4 Cir., 259 F. 166, 168; General American Transp. Corp. v. The Patricia Chotin, D.C.E.D.La., 120 F.Supp. 246, 249. Not only was this presumption not rebutted by respondents, but negligence and lack of reasonable care in the operation of respondent vessels were affirmatively proved.

3. The respondent vessels are liable to the libelant for damages resulting from the actionable negligence of repondents' owners and their agents, as hereinabove found, which proximately resulted in the damage to Drolls Point Light.

■ 4. The M/V Martin and the Barge MOS–101 were, and each of them was, on April 19, 1956, a vessel used and employed within the meaning of the provisions of 33 U.S.C.A. § 412, in injuring and damaging Drolls Point Light, a work built by the United States for the preservation and improvement of its navigable waters, in violation of 33 U.S.C.A. § 408.

5. As a consequence of the collision, libelant incurred the reasonable costs and expenses of $12,186.99. Libelant is entitled to recover its reasonable costs and expenses upon each theory stated in the libel, namely, in admiralty, for damages proximately resulting from the negligent operation of the respondent vessels and, also, under 33 U.S.C.A. § 412, for damage to the light occasioned by the collision therewith of the respondent vessels.

■ 6. Libelant is entitled to recover a pecuniary penalty against each of the respondent vessels pursuant to the provisions of 33 U.S.C.A. § 412, with reference to 33 U.S.C.A. §§ 408 and 411. The penalty provisions of the Section impose absolute liability, *in rem*, against any vessel violating the Act, regardless of the negligence or intent of the owners or masters of the vessel. United States v. The Terry E. Buchanan, D.C.S.D.N.Y., 138 F.Supp. 754; United States v. The Republic No. 2, D.C.S.D.Tex., 64 F.Supp. 373.

7. Libelant is entitled to judgment in its favor dismissing the cross-libel herein; and to judgment in its favor against each of the respondent vessels in the amount of $12,186.99, with interest at 6% *per annum* from April 19, 1956, against the respondent, M/V Martin, for a pecuniary penalty in the sum of $500, and against the respondent, Barge MOS–101, for a pecuniary penalty in the sum of $500, together with its costs.

Judgment is ordered accordingly.