## THE GRAND MANAN (four cases).

### (District Court, D. Maine. October 15, 1913.)

### Nos. 215, 244, 245, 248.

1. NAVIGABLE WATERS (§ 23*)—OBSTRUCTION OF CHANNEL BY ANCHORED VESSEL—CONSTRUCTION OF STATUTE.

Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), providing that "it shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft," is not an absolute prohibition of the anchorage of vessels in navigable channels, but is intended to prevent their anchoring in such a way as to monopolize such channel, and is not violated where sufficient passageway is left for other vessels.

[Ed. Note.—For other cases, see Navigable Waters, Cent. Dig. § 64; Dec. Dig. § 23.*]

2. COLLISION (§ 69*)—MOVING AND ANCHORED VESSELS—FAULT—ANCHORAGE IN CHANNEL.

A collision occurred at night in the St. Croix river, a tidewater stream between Maine and New Brunswick, between a steamer passing up and a dredge employed in deepening the channel under a contract with the United States, which had remained in its working position, where it was held by four spuds and also by bow and stern anchors up and down stream attached to wire hawsers from 325 to 600 feet long; the position of the anchors being shown by timber buoys lying flat on the surface and unlighted. The dredge was lying near the American side of the channel, with two scows alongside on the channel side, but leaving at that stage of the tide sufficient width of channel toward the Canadian side for the steamer to have passed at a distance of 150 to 200 feet. It was a bright moonlight night in summer, with a light breeze, and the steamer, which made frequent trips on the river, had passed down an hour or two before. The tide was ebb and set toward the American shore. The dredge and scows were properly lighted. The dredging contract required the buoys to be lighted when so placed as to "endanger or to obstruct navigation." Held, that the position of the dredge and scows was not such as to "prevent or obstruct the passage of other vessels" in violation of Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), nor were her anchor buoys an obstruction, and that she was otherwise free from fault; that under the rule that a moving vessel is, prima facie, in fault for a collision with an anchored vessel the evidence did not exonerate the steamer, which must be held solely in fault.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 87–90; Dec. Dig. § 69.*]

In Admiralty. Suits for collision by the Bay State Dredging Company, Limited, owner of Dredge No. 4, and by Frank Silver and others, against the steamer Grand Manan; the Grand Manan Steamboat Company, claimant. Libel by Daniel F. Warren, administrator of estate of James H. Carey, deceased, against the Grand Manan Steamboat Company, and cross-libel by the Grand Manan Steamboat Company against the Bay State Dredging Company, Limited. Decree for libelants, and cross-libel dismissed.

Blodgett, Jones, Burnham & Bingham and T. F. McAnarney, all of Boston, Mass., for libelants Bay State Dredging Co., Limited, Silver and others, and Warren.

Benjamin Thompson, of Portland, Me., Edward S. Dodge, of Boston, Mass., and George J. Clarke, of St. Stephen, N. B., for cross-libelant Grand Manan Steamboat Co.

HALE, District Judge. On the evening of June 26, 1912, the steamer Grand Manan, owned by the Grand Manan Steamboat Company, a New Brunswick corporation, came into collision with the steam dredge known as No. 4, while moored in the St. Croix River, between the state of Maine and the province of New Brunswick. The dredge is owned by the Bay State Dredging Company. In No. 215 the owner of the dredge seeks to recover for her damage sustained by reason of said collision. The libel in 244 presents the case of the crew of the dredge, who seek to recover for loss of personal effects. In 245 Daniel F. Warren, administrator, seeks to recover, under the Maine statute, for the loss of life of Capt. James H. Carey, the engineer and mate of the dredge. No. 248 is the cross-libel of the Grand Manan Steamboat Company against the Bay State Dredging Company, to recover damages sustained by the steamer in consequence of the collision.

The steamer Grand Manan is a wooden, screw, steam vessel, of about 180 tons burden net, drawing 10 feet aft, and 7 feet forward; carrying a crew of 10 men all told. She had fore and aft compound engines, giving her a speed of 10 knots.

The dredge is a wooden vessel, 80 feet long, about 33 feet wide, drawing about 5 feet forward, and 4 feet aft; 8½ feet high, measuring from the bottom to the top of her hull.

On the evening in question, the steamer Grand Manan was carrying an excursion party for a moonlight sail down the St. Croix river to St. Andrews, and return. On her return trip upriver, at about 20 minutes past 11, she collided with the dredge, striking nearly head on, about eight feet from the starboard corner of the dredge, cutting in for a distance of about eight feet on deck, and through five or six streaks below the water line. The dredge sank within a few moments, holding the stem of the steamer in or near the breach caused by the impact; her A frame, or boom, caught in the bow of the steamer. The Grand Manan came clear of the dredge about 3½ hours later, when the tide had reached low water. The scows were not damaged. At the time of the collision, the wind was light, from the north, blowing downriver; the tide between 2½ and 3½ hours ebb, running about three knots an hour, several points across the fore and aft line of the dredge, toward the American shore. The atmosphere was clear; the sky bright, starlight and moonlight.

The libelant contends that, as the collision took place when the dredge was properly anchored where she had a right to be, on a clear, bright night, when objects were visible at a long distance, the presumption is in her favor, and against the steamer, that, under the provisions of law, it was the steamer's duty to keep clear of an anchored vessel, and that a moving vessel colliding with a dredge at anchor must exonerate herself by showing that it was not in her power to prevent the collision by any practicable precautions.

The claimant contends that the dredge was at fault, in that she was anchored in a narrow portion of the channel of the St. Croix river, in such a manner as to prevent and obstruct the passage of other vessels in the navigable channel; that her fault in anchoring, and remaining at anchor in the night in the locality selected by her without compelling necessity for such selection, was a violation, not only of the general maritime law, but also of the statute law of the United States, as contained in the provisions of section 15 of Act of Congress of March 3, 1899, c. 425 (30 Stat. 1152 [U. S. Comp. St. 1901, p. 3543]); that the dredge was therefore at anchor in an unlawful situation, and the burden of proof is upon her to show that the collision did not occur by reason of her exposed and unlawful situation, but did occur by reason of the negligent conduct of the steamer. The claimant also charges the dredge with other faults; especially with placing a hawser in the waters of the St. Croix river, or permitting it to escape into the water, and to be in the vicinity of the lower anchor buoy of the dredge, that, while in the vicinity of the lower anchor buoy, the hawser in question fouled the propeller of the Grand Manan while she was proceeding upriver, making the steamer unmanageable, and that the collision was caused solely by the fault of the dredge.

In the consideration of the case, it is evident that much depends upon the court's finding on the question whether, at the time of the collision, the dredge and scows were at fault in lying anchored in a narrow channel, as alleged by the claimant, thus preventing and obstructing the passage of the steamer and other vessels. This question should receive the first attention of the court; as certain other questions may be affected by this finding.

I. (a) What, then, was the position of the dredge upon the evening in question? Was she at fault in that she was anchored in the narrow channel of the St. Croix river?

The St. Croix river is a tidal stream. The bottom is of a shifting character, quite largely of sawdust formation. The tides rise and fall about 21 feet; their velocity, as well as the direction of their set, varies at different stages. At high water the river is navigable for deep draft vessels. On the evening of June 26, 1912, the libelant was operating the dredge under a contract with the United States government for the improvement of the river. The contract under which the work was carried on contained, among other things, the usual provisions that the contractor assumes responsibility for the safety of his employés, plant, and materials, and for damage done to or by them from any source; that the contractor shall keep proper lights each night between sunset and sunrise on all the floating plant connected with the work; upon the ranges and stakes in connection with it when necessary; upon all buoys large enough, and so situated as to endanger or to obstruct navigation, and shall be responsible for damages resulting from neglect in this matter; that the contractor shall be required to conduct the work in such a manner as to obstruct navigation as little as possible, and at the completion of the work shall remove his plant, including ranges, buoys, and piles placed

by him in navigable waters; that in case the dredge is so placed by the contractor as to obstruct the channel and impede the passage of vessels, it shall promptly be moved so as to afford a practicable passage.

It appears to have been the intention of the government to excavate a channel about 200 feet in width, through that part of the river which was then used for navigation. Upon this work the dredge had been employed since May 16, and was held in position by the use of four spuds, one at each corner, each spud about 16 inches square and about 72 feet long. In addition to the spuds, the dredge had also as a bow mooring an anchor of about 950 pounds weight, to which she was connected by a three-quarter inch steel cable, running downstream a distance of about 325 feet, and a similar anchor at the stern, also connected by a steel cable, running upstream about 600 feet. The location of each anchor was indicated on the surface by an anchor buoy about 27 feet long, and 18 inches in diameter. These buoys floated flat upon the water, were without lights, and were connected with the anchors by wire ropes. The dredge was equipped with the usual clam-shell buckets, with which the material forming the bottom of the river was raised, and thus deposited into scows made fast alongside of the dredge. These scows, when loaded, were towed to a dumping ground near the mouth of the river. On the evening of the injury, the scows were lying tandem on the port side of the dredge, toward the Canadian shore of the river, loaded with dredged sawdust. The after scow was 65 feet long, 20 feet wide, and 6 feet deep; the other was 80 feet long, 28 feet wide, 9 feet deep, and projected about half its length ahead of the dredge. The scows were fastened to the dredge by lines at the bow and stern. They were at work at a point in the river just above the location known as "The Narrows," about one-eighth of a mile above the Whitlock Mill light, and nearly on a line between that light and the Black Buoy. The bow of the dredge, in which her crane and buckets were located, was headed downriver. On June 26th no change had been made in the position of the dredge at any time when she was not in operation, and no suggestion of a change had been made by the harbor master, or by any local authority. She had been allowed to remain through the night in the position she was in at the close of the day. Steamers and other vessels bound to and from Calais or St. Stephens sometimes passed up and down on the flood and ebb tides through that part of the river where the dredge was located. In the vicinity of the dredge, on the Canadian side, there were 12 feet of water at mean low tide, where the channel had been dredged; and, under the dredge and abreast of her, on the American side, the evidence shows from 6½ to 9 feet at mean low water. The location of the dredge, and of the buoys, were determined by the government inspector. At the time of the collision, the starboard side of the dredge was within 35 feet of the American side of the channel then being dredged to a width of 200 feet; her port side was 134 feet from the edge of the new channel on the Canadian side. The dredge and scows were then on the American side, the dredging having been

completed on the Canadian side. It was about 2½ to 3½ hours' ebb tide on a high course tide; there were then at least 14 feet of water above mean low tide; and the Grand Manan drew about 10 feet. The evidence convinces me that at that time of the tide the steamer could have gone 150 to 200 feet on the Canadian side of the scows. It was a clear, bright night; the position of the dredge and scows, and of the buoys, was well known to the master of the steamer, who had made regular passages upon the river, and had come down the river a few hours before. Capt. Coleman, the harbor master, had never complained of the position of the dredge or scows; he says he found no trouble in navigating by the dredge, and knew of no one who did; that in following the regular channel of the river at any stage of the tide, a steamer would leave the dredge and scows, as they were anchored that night, about 125 or 150 feet to port; that "the dredge was anchored to the western edge of the channel"; that the "old channel," to which he often refers, was the channel vessels were accustomed to use before dredging operations were commenced. Capt. Littlefield testified that the channel where vessels passed and repassed was on the port side of the dredge. A preponderance of the evidence induces me to believe that the vessel was lying in the cut which was intended to become a regular part of the channel of the river, when the work of excavation had been completed. She was, as Capt. Coleman says, on the western edge of the channel.

[1] The general maritime law has always recognized it to be unlawful for a vessel to anchor, without necessity, in an exposed position in a channel, or anywhere in the path of commerce in such a way as to leave an insufficient passageway for vessels properly navigating in the vicinity. The act of March 3, 1899, provides:

"It shall not be lawful to tie up or anchor vessels, or other craft, in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft."

This act seems to be declaratory of the general maritime law upon the subject.

In The Caldy, 153 Fed. 837, 840, 83 C. C. A. 19, 22, the Circuit Court of Appeals for the Fourth Circuit said:

"We do not think the Congress intended by Act March 3, 1899, c. 425, § 15, 30 Stat. 1152 (U. S. Comp. St. 1901, p. 3543), to absolutely forbid anchoring in navigable waters, except only at such places as the location of the vessel would necessarily prevent the passage of other vessels, or obstruct them in passing to such an extent as to make the effort to do so a dangerous maneuver. If a vessel anchors at a point in a channel where, notwithstanding such anchorage, other vessels, navigated with the care the situation requires, can safely pass, then she has neither violated the statute, nor rendered herself liable under the general rules applicable to navigation, even though to a certain extent she has obstructed the channel."

In The Europe, 190 Fed. 475, 479, 111 C. C. A. 307, 311, the Circuit Court of Appeals for the Ninth Circuit held that a vessel might lawfully lie at anchor in the nighttime in the deep channel of a navigable river, if not so placed as to prevent or obstruct the passage of other vessels in violation of the act of Congress prohibiting such obstruction. The court said:

"We also hold that the words 'prevent or obstruct' in this statute are positive words, indicative of limited restraint and of legislative intent to not interfere with the right use of waterways by imposing an absolute or unreasonable prohibition."

[2] In The D. H. Miller, 76 Fed. 877, 22 C. C. A. 597, the court in this circuit passed upon the general maritime question, although before the passage of the act of 1899. The court held a dredge to be without fault for lying overnight in her working position, so long as her location did not seriously embarrass the movements of the steamer which collided with her. In the Job H. Jackson, 144 Fed. 896, 900, the District Court for the Eastern District of Virginia held that the trend of interpretation of the act of 1899 was to give it a liberal meaning; that its purpose was not to prevent vessels from ever anchoring in navigable channels, but from doing so in such a manner as to obstruct such channels, or render navigation difficult. In Kent v. Eastern Dredging Co., 193 Fed. 808, the court in this district had before it the case of a drill boat, moored with its center over the line of the most easterly cut made by her in her excavations. She was thus lying in a position somewhat similar to that in which the dredge lay in the case at bar. It was not even suggested by counsel that the dredge was anchored in violation of the act of March 3, 1899. In the late case of The R. G. Townsend (C. C. A.) 205 Fed. 514, the steamer had dragged her anchor on account of the breaking down of her machinery, and had drifted into the channel; she was held to be free from fault; and no suggestion was made that she was within the mischief of the act of 1899. In the City of Birmingham, 138 Fed. 555, 71 C. C. A. 115, a steamer, 320 feet long, while proceeding up the Savannah river, in the early morning, collided with a dredge anchored about 200 feet south of the center line of the channel, but within the regular channel. The lower court held the steamer solely at fault, but the Court of Appeals held the dredge also at fault, and that the precautions taken by a vessel anchoring in a dangerous position should be commensurate with the perils assumed; that the dredge must show some controlling reason for monopolizing the navigable waters of the channel. In that case, the dredge was light, and could easily have been moved. The court found that when its five lines were taut the dredge "occupied practically the entire channel." The case states the law clearly and fully with reference to a vessel anchored in the midst of a channel, and bases its decision upon the broad principles of maritime law declared by courts both before and after the passage of the law of 1899. In The Bailey Gatzert, 179 Fed. 44, 102 C. C. A. 612, the Circuit Court of Appeals for the Ninth Circuit had before it the case of a steamer which, while descending the Willamette river on a foggy morning, collided with a dredge anchored in a channel 200 feet wide. The dredge was held not to have violated the act of March 3, 1899, for the reason that plenty of room was left in the channel for the passage of vessels up and down the river, although the river carries a large commerce, and vessels engaged in transportation are to be expected at all points, and at all hours. The court indicates the spirit as well as the letter

of the act to be the prevention of vessels from anchoring in such a way as to monopolize navigable channels. The test generally applied by the courts is whether. the vessel is so anchored as to leave a sufficient passageway for others. It is this reasonable rule that should be applied to the facts in the case at bar. I have found that the dredge was in the cut at the westerly side of the channel; clearly she was not monopolizing the navigable waters of the channel. Her position on the edge of an excavated channel was not unlike that of the dredge in the Virginia Ehrman, 97 U. S. 309, 315, 24 L. Ed. 890. A fair preponderance of the evidence leads me to the conclusion that the dredge and scows were free from fault in their location at the time of the collision. They were not within the mischief, or the spirit of the act of March 3, 1899.

(b) The claimant also charges the dredge with fault, in that proper lights were not maintained, and exhibited upon her, nor upon the scows and lower anchor buoy. The claimant refers to the act of June 7, 1897 (c. 4, 30 Stats. 98 [U. S. Comp. St. 1901, p. 2879]), which provides that a vessel under 150 feet long, while at anchor, shall carry forward, where it can best be seen, and at a height not exceeding 20 feet above her hull, a white light, in a lantern so constructed as to show a clear, uniform, and unbroken light, visible all around the horizon for a distance of at least one mile. The evidence shows that the dredge had a brightly burning, white, masthead light; that it also had a large, lighted lantern in the engine room on the forward end, shining through the window; that the dredge and scows were visible for a long distance in the moonlight; and were seen as soon as the steamer rounded the point below. Capt. Littlefield, of the dredge, testifies that each scow had a white light on each end. It is urged on behalf of the steamer that the absence of lights upon the dredge and scows contributed to the injury in several important particulars. I do not think this contention is sustained by the evidence. If there was any defect in the lighting of the dredge and scows, I am satisfied by a preponderance of the evidence that such defect or default did not contribute to the injury. There was nothing to prevent an approaching vessel from seeing them in time to avoid a collision.

(c) There was no light upon the lower anchor buoy; and there was a general provision in the contract that proper lights should be kept upon all buoys so situated as to endanger or obstruct navigation. It is contended by the claimant that the lower anchor buoy was an obstruction to navigation, and a light upon it would have tended to prevent the collision. Capt. Coleman, the harbor master, says that a light upon the lower anchor buoy would have made it much easier to locate the buoy; that there were shadows on the river which made some difficulty, and were embarrassing to those "not familiar with them"; but it does not appear that he had ever asked to have the buoy lighted, or that any government inspector had made such request. While the claimant insists that "the anchor buoy was one of the deceptive matters that the captain of the steamer had to guard against," I cannot find enough in the record to justify me in finding that the anchor buoy was an obstruction to navigation, and that it contributed to the colli-

sion. On the other hand, the whole testimony satisfies me to the contrary. The unlighted anchor buoy was not, in my opinion, an obstruction to navigation, and did not contribute to the collision.

(d) It is contended, too, on the part of the claimant, that the anchor watch on the part of the dredge was incompetent. Sughrue, the night watchman, was on duty on the dredge at the time of the collision. His hours of duty were from 6 p. m. to 6 a. m.; he had been up and fully dressed from 6 o'clock in the evening to the time of the injury. Immediately after the collision, he was seen by the crew of the dredge with his cap on, and with a lantern in his hand. He had seen the steamer pass down by the dredge earlier in the evening; and at about 11 o'clock he heard her coming up river; he testifies he believed her to be the Grand Manan; but noticing that it was a bright night, and that the lights of the dredge and scows were burning brightly, he returned to the engine room for about 10 to 15 minutes and cleaned out one fire; he then came up on the port side with the lantern in his hand, walked forward, and saw the Grand Manan 100 feet away, coming towards the dredge at such an angle as to pass by, he thought, close on the starboard side. When the crash came, he called the crew of the dredge, consisting of eight men—first going on top of the house and calling Capt. Carey by name. He found the operating door open, and heard a sound inside Capt. Carey's room. He awakened the other members of the crew by knocking upon their doors, and calling out that the dredge was sinking. He is corroborated by some of the crew. The efforts he made to awaken the men caused him to be too late to get into his room and thus save his personal effects. After he had got out upon the scow with the others, and saw that Capt. Carey was missing, he called out Capt. Carey's name several times. Those in charge of the Grand Manan could see the dredge and scows and their lights, as soon as she rounded the point. They had passed down by the dredge 1½ hours before, and must be assumed to have known her position. In view of these facts, I cannot hold that the failure of the anchor watch to warn the steamer as she approached the dredge was a fault conducing to the collision. On the other hand, a preponderance of the evidence leads me to the opposite conclusion.

(e) The claimant contends that those in charge of the dredge should have slackened the anchor cables, or released her spuds or moorings in order to avoid the collision. The evidence tends to show that lifting the spuds of the dredge would have taken at least an hour. The use of spuds is necessary in the daytime to hold the dredge to the cut; and at night to withstand the cross currents. Under the circumstances of the case, the operation of lifting the spuds was not a manœuver which the law requires. In The D. H. Miller, 76 Fed. 877, 879, 22 C. C. A. 597, 599, in speaking for the court, Judge Putnam comments on the contention made in that case that the dredge was in fault for not raising her spuds when she saw the probability of a collision. He says:

"This was not a manœuver of such a customary nature, or so clear as to its probable effect, that we can say the barge was in fault in that respect under the rule in extremis."

I think the same may be said in the case at bar.

II. The dredge, then, being free from fault in reference to her situation, the burden is upon the steamer to exonerate herself from blame by showing it was not in her power to prevent the collision by any practicable precautions. The D. H. Miller, 76 Fed. 877, 879, 22 C. C. A. 597. In Marsden on Collisions at Sea (3d Ed.) pp. 35, 501, the rule is thus stated:

"A vessel under way is bound to keep clear of another at anchor." "A vessel under headway, in the daytime, or on a clear night, which runs into another at anchor, or stationary in the water, is prima facie at fault."

In The Virginia Ehrman, 97 U. S. 309, 314 (24 L. Ed. 890), speaking for the Supreme Court, Judge Clifford announced the rule:

"Vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame by showing it was not in her power to prevent the collision by adopting any practicable precautions."

Does the testimony in the case at bar exonerate the steamer in motion from blame for the collision with the dredge at anchor? The claimant seeks to show that the collision was caused by the fact that one of the hawsers on board of the dredge was negligently allowed by the libelant to get adrift, that in the vicinity of the lower anchor buoy of the dredge the hawser fouled the propeller of the Grand Manan while she was proceeding upriver, making her unmanageable, and resulting in the collision, and that thus the injury was caused solely by the fault of the dredge. No direct proofs are offered that any hawser got adrift in the river before the collision; but the claimant asks the court to draw the inference from the testimony that the hawser was blown off the house of the dredge in the afternoon of the day of the injury, or that in some way it was allowed to drift from the dredge; that this hawser was carried downriver to the lower anchor buoy, and there became entangled in the propeller of the steamer; that, after passing the lower anchor buoy, the steamer became unmanageable in consequence of the hawser having fouled her propeller; that, by reason of such fouling, she fell off to port against a port wheel, so that her rudder had little, if any, effect upon her steering; and, as a direct result of such fouling, the collision occurred.

The claimant supports this contention by proofs tending to show that:

(1) When the Grand Manan was in the vicinity of the dredge's bow mooring, and less than 500 feet below the dredge, her engines were observed to slow down, and at practically the same time difficulty with her steering was noticed.

(2) Just before the collision her engines could not be reversed; after the collision they could not be operated ahead or astern until the following afternoon, when the hawser had been removed from her shaft; and, after such removal, the engines were in practically their ordinary condition.

(3) Certain photographs, taken the afternoon following the collision, as soon as the tide had ebbed sufficiently to expose the propeller,

show conclusively that the hawser was taken on while the engines were in headgear.

The evidence offered on behalf of the claimant tends to sustain the above three propositions. Some of this evidence is of much probative value, and tends to show that at the time of the collision the steamer was in first-class condition; that she was a good handling steamer; that on the night in question, if she had responded as she ordinarily did, the change of wheel which the captain gave her would have carried her on to the Canadian side of the dredge; that no slowing down of the steamer was noticed until she was headed directly for the port corner of the dredge; and up to that time there had been no trouble with the wheel; that the whole trouble happened in a short time; that the steamer's wheel was put to port as hard as it could be; that she did not respond, but kept falling off to port. The mate testifies that when the steamer was close to the dredge's anchor buoy, he thought there was going to be trouble; that she tended to swing off, and he did not think she was minding her wheel. The claimant introduces a large body of testimony tending to show that the hawser was picked up by a fan of the steamer's propeller while her engines were in headgear; that the freezing of her engines was the inevitable result and the direct cause of the injury; that the influence of the hawser on the steamer's navigation was first shown by her slowing down, and was immediately followed by her rudder becoming practically useless. It is contended that all the testimony relating to the conduct of the steamer, after she came up to the anchor buoy, leads to the conclusion that the bight of the dredge's hawser fouled one of the fans of the steamer's propeller, while her engines were in headgear, and while a considerable part of the hawser was leading upstream; that the winding of the hawser tended to draw the stern of the steamer to starboard, and cause her bow to fall off to port; and it continued in that way until the leading part of the hawser was abaft the steamer's beam; then the steamer continued on practically a straight course; the final effect of winding the hawser on to the steamer's propeller shaft operated to draw it in so hard that it was compressed between the stern bearing and hub of the propeller; as a result the steamer's engines were frozen, and the collision inevitably followed; a short time after the collision occurred, the steamer was found to have this hawser around her shaft, and at that time her engines could not be forced, nor thrown over the center by the use of a pinch bar. The slowing down of the steamer's engines, and the trouble with the steering, was first experienced near the lower anchor buoy; just before the collision the steamer's engines could not be reversed, and after the collision they could not be worked ahead or astern until the following afternoon, when the hawser had been removed from the propeller; the engineer was in the engine room at his post; when the steamer struck the dredge's lower anchor buoy, a scraping and bumping was felt, and the buoy jumped 12 or 15 feet in the air, almost directly astern of the steamer, and difficulty was at once experienced in steering; the engines began to slow down, and the steamer became unmanageable. In behalf of the steamer, it is

urged that all these facts can be accounted for in only one way—that the hawser in the steamer's propeller created the difficulty, and caused the injury.

The learned proctors for the claimant lay great stress upon the testimony from photographs tending to show that the hawser was taken on to the propeller shaft while the engines were in headgear, and while the steamer must have been going ahead; and it is urged that the manner in which the hawser was taken on to the propeller is not theory, but is the only conclusion that can be drawn from the evidence, corroborated as it is by the conduct of the libelant and its men after the collision. Waters, the first officer of the steamer, testifies that he thinks the steamer picked the hawser up just before she came to the lower anchor buoy; that he did not come to this conclusion until quite a while after the collision; but he kept thinking about it, and how the hawser rolled on to the hub, and he thought the steamer picked it up when she was going ahead, just before she came to the buoy; that he did not know how it was picked up, but since seeing the photographs, he thinks it was picked up below the anchor buoy; that he never thought it was fastened to the buoy, and did not know what it was fastened to; that on examination of the photographs, he could tell from the bight being on the forward part of the blade and leading to the port side of the shaft, and beneath all the turns, he could see it went on first. He is positive there was not an eye on either one of the blades; that it looked to him as if the engines were going ahead, because the two ends coming down from the leading parts of the bight were underneath the whole of the turns as near as he could see; that the other turns were wound over them, and from what he saw the rope was apparently pretty well under the turns, and very much mixed up. Several photographs were introduced, and a great body of testimony was taken on this subject. Capt. Coleman, Capt. McDuffy, and other reliable witnesses are convinced by the photographs that the propeller was in headgear at the time the hawser was taken on. Capt. Mulcahy, a well-qualified expert, testified from the photographs that the wheel was in headgear when the hawser was taken on, because the loop was over the forward side of the fan. Other experts agree with him. The claimant urges that when Capt. Lewis and others, in behalf of the dredge, went down to see the dredge and examine the steamer, they did not then claim that the claimant's position as to the manner in which the hawser was taken up was not true, but that later the dredging company set up the contention that the hawser was washed off the dredge while the two vessels were together, and picked up while the engines were reversed.

The libelant's testimony tends to show that the hawser, found in the propeller of the Grand Manan and produced in court, was a six-inch Manilla hawser, and had a bridle at each end; that all the hawsers in use by the dredge are accounted for substantially as follows: The only six-inch hawsers owned by the libelant in connection with the work on the St. Croix river were four Manilla hawsers; one of these was taken away upon a tug, but was returned before the collision; three of them, just previous to the injury, were coiled up on the house

of the dredge, and none had been in use since June 3d; two six-inch hawsers were coiled, one on top of the other, upon the house of the dredge aft the big hatch. Some of the crew of the dredge swear that the hawsers on the house, including the six-inch hawser with the five-inch line on top, were seen there daily up to the time of the collision. Capt. Littlefield testifies that as late as 4 o'clock in the afternoon of the day of the collision he saw the six-inch hawser on the house, with the small five-inch piece on top. Several members of the crew testify that this particular hawser was the one found in the propeller of the Grand Manan, and produced in court; that it is recognizable, among other things, by its unusual weight, the parceling, and the bridling; that the dredge sank quickly, and in sinking tilted down to starboard at the forward end; that this particular six-inch hawser was the first one covered with water; that the current was about three knots an hour; and the point of impact of the steamer about eight feet from the starboard corner. Thompson, a member of the crew, testifies that this six-inch hawser, with the five-inch piece on top, was seen by him to wash off the dredge as she sank, and as the water came up over the starboard corner of the house; that it drifted off the house, first in a coil, and then opening up in the current; that it passed the A frame and out by the Grand Manan; that later other lines floated, but did not float off the dredge. Thompson's testimony was tested by a severe cross-examination; it did not seem to me to be impaired by the test. He was corroborated by Anderson, and by some other members of the crew. This testimony is attacked with great force by the learned counsel for the claimant. It is contended by the claimant that the identification of the six-inch hawser as the particular one brought from Boston was imperfect and unreliable.

The libelant offers evidence tending to show that while the dredge and steamer were together after the accident, certain witnesses heard the main engine of the Grand Manan throb, and her propeller turn, and saw the engineer work his engine; that the engine did actually work, and that white wheel water was seen at the stern of the steamer; that the steamer was seen to back out for a short distance. All this testimony with regard to the actual working of the engine and the turning of the propeller was submitted to a most severe and critical attack. Testimony is offered by the libelant that all the hawsers on the dredge were recovered the day after the dredge sank, except this particular six-inch hawser with the five-inch piece on top, which had been on the starboard side forward, and was seen to float overboard toward the steamer.

The dredge offers testimony that the trouble with the steering of the steamer did not begin at the anchor buoy, or above it, but was observed some 400 feet downstream, below the anchor buoy, and for several minutes before the collision, while the steamer was upon the sawdust beds, which extend from the Canadian shore to within 125 feet of the American shore opposite Hill's Point; that the cause of the steamer's bad steering was that she there smelt bottom; that Capt. Ingersoll testified at first that when he began to observe the steamer's failure to answer her helm, she had not got up to the anchor buoy,

but was on the sawdust beds below. Capt. Coleman testified that if, the vessel's engines were stopped when she was going through the water at five or six knots, she would not go over twice her length. There is some testimony from passengers tending to show that the vessel's engines did not stop, but that the throb of the main engine was heard up to the time of the crash, which could not have happened if the hawser had been in the propeller.

In behalf of the dredge it is urged, too, that it is not necessary to attribute the collision to the presence of the hawser in the propeller; but the whole testimony on the part of the steamer and those in charge shows faults which were undoubtedly the direct cause of the collision. It is not denied that navigation on the St. Croix river is at all times difficult, especially so in the night, at the location where the collision occurred, where the tide sets diagonally towards the American shore, turning sharply to starboard going upstream, where shifting sawdust beds cover the bottom, and where these difficulties are overcome only by the precaution of competent navigators. It is pointed out that Capt. Ingersoll said he had not been on the river at night before during that season, and only two or three times the year before; that on the evening in question he was the only officer in the pilot house, and was performing the double duty of officer in charge and helmsman; that he had with him a certain Mr. Maxwell, who chartered the steamer, and that two ladies were also there; that while approaching the scene of the accident, he was in conversation with these three passengers, notwithstanding the statute of the United States and the regulations of the Department of Commerce and Labor prohibiting the same, and that a copy of these regulations was posted in the steamer's pilot house. On the other hand, the captain says that he was paying no attention to the passengers at the time of the collision. It is contended, too, on the part of the dredge that the ebb current was running diagonally towards the American shore at the rate of three knots an hour, which caught the steamer coming around Hill's Point on the starboard bow; that the normal steam pressure of the steamer is 115 pounds, but that during the evening in question she had on only 80 to 90 pounds, which is sufficient to propel the steamer only at about half speed, and that this amount of pressure lessened the ability to handle her; that from three to five minutes before the collision the steamer was seen to slow down gradually, and not to mind her helm; and that at the time those on board believed she was smelling the bottom. It appears from the testimony of Capt. Coleman and others that the course that Capt. Ingersoll was steering near Hill's Point would bring him upon the sawdust beds on the Canadian side, whereas the deeper water rounding Hill's Point is on the American side.

It is contended that if the Grand Manan smelled bottom upon the sawdust beds, with the tide 2½ hours' ebb, running three knots or more per hour towards the American shore, with her already reduced speed and her greatest depth at the stern, she would slow down still more and turn to port, and refuse to answer her helm; that it was the duty of Capt. Ingersoll to have the steamer under perfect control in the position in which he was placed; that his failure to do so should

be construed strictly against him, and against the claimant; that under the decisions of this court he must be presumed to have full knowledge of the condition of the tide, current, bottom, and the exact position of the dredge and scows; that after the steamer refused to go to starboard, and seemed to be yawing to port, he should have put his helm to starboard and gone to port, upon the American side of the dredge. It must be said of this last contention that the evidence is contradictory relating to the water upon the American side, and whether it would have been safe for the steamer to have gone upon that side; but it is at least true that the captain did not try to starboard his helm, and does not know whether the engines would have responded if he had undertaken to do so.

It is further urged by the libelant that Capt. Ingersoll could clearly see the dredge and scows on the bright moonlight night, and that their position should have been well known to him, as the steamer had passed up and down the river many times when the work was going on, and the same evening she had passed by on the Canadian side about 100 or 150 feet away. The dredge charges also that the steamer had an incompetent engine department; that from the testimony of the passengers and others the engineer was not attending to his duty on the night in question, and for a part of the time was not in the engine room, but was talking with friends outside who were on the excursion, that he was not paying strict attention to his business, and that the Grand Manan did not have proper lookouts.

Evidence is offered on behalf of the libelant from experts who testified with regard to the photographs, and who concluded from their examination, that for a bight of the hawser to be on in the way it was, the propeller must have been in reverse gear. Capt. Coleman, an expert called by the claimant, when recalled on direct examination, testifies that just one thing makes him think the wheel was in headgear, and that is the position of the loop over the forward side of the fan; but he says further:

"It would be possible for this loop to be so in reverse gear; I think you can get them on most any shape you want to."

The evidence is very voluminous; a sharp contention is made upon every point in the case. I have been assisted in coming to a conclusion by the fact that I have seen all the witnesses, heard their testimony, and have myself taken part in the examination during the progress of the trial.

Having found that on the evening in question the dredge was not in fault in respect to her location at the time of the collision, or in respect to the other charges against her—it appearing that no claim is made that the collision was the result of inevitable accident—the court is compelled to follow the rule that a vessel in motion must exonerate herself from blame by showing it was not in her power to prevent the collision by any practicable precautions. After an examination of all the evidence, I am forced to the conclusion that the steamer has not so exonerated herself from blame. I am of the opinion that she has not shown that the hawser in question became entangled in the pro-

peller shaft before the collision, and was the cause of the captain's failure to steer the vessel and avoid the dredge. On the other hand, I am of the opinion that there is a fair preponderance of the evidence that the hawser was on the deck of the dredge at the time of the collision, and became entangled in the propeller shaft after the collision. I cannot come to the conclusion that certain direct testimony upon this point was false and perjured. While the testimony of the photographs is interesting, and has required much study, I cannot hold this testimony to be controlling, against the positive, direct testimony that the hawser in question was upon the dredge at the time of the collision. It is unnecessary to point out the exact fault of the steamer which caused the collision. On a clear, bright night she ran into a dredge at anchor. She has not, by satisfactory proofs, exonerated herself from fault. She must, then, be charged with fault.

III. No. 244, Frank Silver et al. v. The Steamer Grand Manan.

The several libelants are shown to have been members of the crew of dredge No. 4. The testimony shows the presence of these libelants upon the dredge at the time of the injury. It is contended on the part of the claimant that their contributory negligence is proved. Upon an examination of the testimony, I cannot sustain this contention. Upon all the evidence in the case I find they are entitled to recover. This case, with the others, will be referred to an assessor. Upon the coming in of his report, the court will pass upon all further questions.

IV. No. 245. Daniel F. Warren, Adm'r of Estate of James H. Carey v. Grand Manan Steamboat Company.

This action is brought by the administrator under the Maine statutes to recover for the death of James H. Carey, resulting from the collision. The suit is for the benefit of the widow and two minor children: Capt. Carey was in charge of dredge No. 4 on the night of the collision. Without reciting the testimony, I am satisfied by a preponderance of the evidence that his death was immediate, and was the proximate result of the collision. Under the statute, the libelant is entitled to compensation not exceeding $5,000, with reference to pecuniary injuries resulting from his death to the persons for whose benefit the action is brought. It is not proven that the libelant's intestate was at fault, in that he was guilty of contributory negligence. No evidence has been offered touching the pecuniary injuries. This case will also go to an assessor. Upon the coming in of his report, the court will act upon such further questions as may arise.

V. No. 248. Grand Manan Steamboat Company v. Bay State Dredging Company, Ltd.

The court finds for the respondent, and orders that the libel be dismissed, with costs for the respondent.

No. 215, Bay State Dredging Company, Limited, v. Steamer Grand Manan; No. 244, Frank Silver et al. v. Steamer Grand Manan; No. 245, Daniel F. Warren, Adm'r, v. Grand Manan Steamboat Company. In each of these cases the court holds the steamer to be solely at fault for the collision, and finds for the libelant. Fritz H. Jordan is appointed assessor. Upon the coming in of his report, the court will pass upon such further questions as may arise.