Accordingly, this Court does not have jurisdiction of plaintiffs' claim and defendant's motion to dismiss will be granted. This is a matter for the state courts.

ALASKA PACKERS ASSOCIATION, INC., and McAllister Equipment Leasing Co., corporations, Plaintiffs,

v.

O/S EAST POINT, Official No. 292,791, her engines, boilers, machinery, tackle, and appurtenances, etc., and Queen Fisheries, Inc., a corporation, Defendants.

Willard S. FERRIS, Individually and as Trustee for William Bittler, et al., formerly crew members of the F/V BELUGA, Plaintiff,

v.

O/S EAST POINT, Official No. 292,791, her engines, boilers, machinery, tackle, furniture and appurtenances, In Rem, and Queen Fisheries, Inc., a corporation, In Personam, Defendants.

Nos. 75–137S, 75–328S.

United States District Court, W. D. Washington.

Sept. 20, 1976.

Bogle & Gates, John P. Sullivan, Seattle, Wash., for plaintiffs in No. 75–137S.

Madden & Poliak, Charles M. Davis, Seattle, Wash., for plaintiffs in No. 75–328S.

Moriarty, Long, Mikkelborg & Broz, Jacob A. Mikkelborg, Seattle, Wash., for defendants in both cases.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEEKS, Senior District Judge.

Early on the morning of August 29, 1973 F/V BELUGA came into collision with O/S EAST POINT while in Alaskan waters at a point near the pass between Narrow Cape on Kodiak Island and Ugak Island. These two consolidated cases are brought by the owner (McAllister Equipment Leasing Co.) and charterer (Alaska Packers Association) of O/S BELUGA for damage sustained to that vessel and the skipper/sub-charterer of BELUGA (Willard S. Ferris) both in his

own behalf and as trustee for his crew to recover damages respecting personal effects lost or damaged in the mishap. Defendants in both cases are the EAST POINT and Queen Fisheries, Inc., her owner. I make the following interlocutory findings of fact and conclusions of law reflecting the greater weight of evidence I credit and believe, on the issue of liability solely:

## FINDINGS OF FACT

1. At all times herein:

a. EAST POINT was a single-screw crab processing vessel of 995 gross tons, 177.3 feet in length, 30.1 feet in width and 480 horsepower which was built in 1943 and substantially altered and refitted in 1971.

b. BELUGA was a single-screw power scow of 164 gross tons rigged for crab fishing, 82.1 feet in length, 26.6 feet in width and 230 horsepower which was built in 1944 and substantially refitted in 1969.

2. EAST POINT departed Kempff Bay at the southern end of Kodiak Island on the afternoon of August 28, 1973 bound for Kodiak making about 6 knots. Anthony E. Olson was master of EAST POINT at the time. He was licensed by the United States Coast Guard as a chief engineer on vessels to 3,000 horsepower and as a master on vessels to 1,500 tons. His watch commenced 0000, August 29, 1973. He was accompanied on watch by two unlicensed crewmen, John Westcoast and Paul Pederson. These three men were stationed together in the EAST POINT wheelhouse. The collision occurred during this watch.

3. EAST POINT crewman Paul Vaaga served as mate on the watch immediately preceding Olson's from 1800–2400, August 28. Vaaga was not licensed, although the gross tonnage of EAST POINT was such that a mate was required by law to be licensed.

4. BELUGA departed the city of Kodiak on August 28, 1973 at approximately 2230 bound for fishing grounds off Dangerous Cape on the southeast side of Kodiak Island. She, too, was making about 6 knots. Willard S. Ferris was her skipper. Dennis McFadden took over the watch at 1000 in relief of Ferris. McFadden stood watch by himself serving as navigator, helmsman and lookout. Neither Ferris nor McFadden were licensed nor required to be licensed.

5. The night of August 28–29, 1973 was dark and clear with a relatively calm sea and excellent nighttime visibility.

6. BELUGA was sailing a southwesterly course, about 200° magnetic, along Kodiak Island heading toward the pass between Ugak Island and Narrow Cape when McFadden first became conscious of the approaching EAST POINT. BELUGA, at that time, was about 1½ miles off Cape Greville, and EAST POINT appeared by radar to be several miles distant. McFadden had both visual and radar contact with EAST POINT as the distance closed.

7. EAST POINT was abeam Dangerous Cape at 0030, August 29 heading approximately 020° magnetic northeasterly toward the passage between Narrow Cape and Ugak Island. Before reaching the spit projecting out from the northwest side of Ugak Island and upon finding its projected course to lie in or near shoal waters on the starboard hand, Olson ordered a course change to approximately 350°–360° magnetic to safely negotiate the spit. Once clear of Ugak Island Olson again ordered a course change to approximately 010° magnetic which course was maintained until the moment of collision. John Westcoast was acting as EAST POINT helmsman throughout these maneuvers.

8. BELUGA made two subsequent course changes to starboard of 5° each from its aforesaid 200° bearing—one when the vessels were about ½ mile apart and another when the vessels were about ¼ mile apart.

9. The above-described course changes by both vessels were made when the vessels were in sight of one another and were unaccompanied by whistle signals. As the

vessels closed upon one another, McFadden on the BELUGA intended a port-to-port passing while Olson aboard the EAST POINT contemplated a starboard-to-starboard passing.

10. When collision appeared imminent, BELUGA made one last desperate starboard maneuver, her rudder being put hard over in the hope of yet effecting the planned port-to-port passing. EAST POINT's helmsman also initiated a last second unsuccessful effort to avoid collision by putting her rudder hard starboard. At the time of impact EAST POINT had not responded to the right rudder. These actions occurred when the vessels were in extremis with collision inevitable.

11. Collision occurred at approximately 0315 a few miles northeast of the pass between Ugak Island and Narrow Cape. Each vessel had maintained a steady speed of about 6 knots up to and at collision. They were thus closing at a combined speed of 12 knots.

12. Olson left the EAST POINT wheelhouse after he had observed BELUGA approaching approximately 1½ miles (5 to 7½ minutes) away in order to observe the movement of other vessels then navigating the area. These other vessels were on courses roughly paralleling the courses of EAST POINT and BELUGA in both directions. Nonetheless, there was ample room for BELUGA to pass on either side of EAST POINT without interference from other traffic. There were no special circumstances obtaining to justify a departure from applicable rules of the road.

13. Olson returned to the wheelhouse only when he heard EAST POINT's steering engine "growl," indicating a radical turn of her wheel. This sound corresponded to the aforementioned starboard rudder maneuver in extremis. He was unable to personally regain control of the conn or give pertinent navigational orders prior to impact.

14. During the voyage from Kempff Bay and at the time of collision, EAST POINT's crab processing equipment included an enclosure or "house" located forward on the main deck used to shelter crab cookers and related processing gear. The house was constructed of large plywood sections fitted on a pipe framework. When assembled, its dimensions were approximately 30 feet long, 16 feet wide and 6–6½ feet high. On the subject voyage the house's plywood roof was in place but its sides were detached to aid navigational visibility. Notwithstanding the removal of the sides, however; the house, cookers and gear substantially obstructed forward visibility, forcing wheelhouse personnel to peer through and around the structure in their efforts to survey the sea area ahead.

15. As required, EAST POINT was displaying colored side lights, a white head light and a white range light, and BELUGA was displaying colored side lights and a white head light. International Rule 2, 33 U.S.C. § 1062. Furthermore, each vessel's crew observed a white running light on the counterpart vessel long before collision. While I am satisfied that each vessel's colored side lights were illuminated, I do entertain serious doubt as to whether they were clearly visible to those aboard the opposing vessel. This doubt is raised by these circumstances: the EAST POINT's foredeck structure and equipment limited forward visibility from that vessel and additionally obscured, continuously or intermittently, her own side lights to oncoming vessels; the watch personnel on both vessels were stationed improperly and disadvantageously for the keeping of proper lookout; BELUGA's helmsman had other duties to occupy his attention, and EAST POINT yawed considerably in making her way.

16. I find it improbable that either vessel was navigating with flood lights on, such as would illuminate the area forward of the wheelhouse on the respective vessels.

17. Both vessels were equipped with radar units which were operational and in use.

18. The respective courses of the two vessels prior to collision were such as to constitute a "meeting" situation, end on or nearly so.

From the foregoing, I make the following

## CONCLUSIONS OF LAW

■ 1. Both vessels were in violation of International Rule 29, 33 U.S.C. § 1091, in not keeping a proper lookout at all times prior to collision. EAST POINT's fault lies in not properly positioning its lookout. A lookout must be stationed "as far forward and as near the water as possible" to be in compliance. *Eastern Dredging Co. v. WINNISIMMET,* 162 F. 860, 861 (1st Cir. 1908). EAST POINT's lookout man was posted in her wheelhouse, a most inferior vantage point, particularly so in view of the aforesaid obstruction. BELUGA was similarly at fault, her helmsman being inadequate to serve in the capacity of lookout. He was improperly posted in the wheelhouse, and he was given duties in addition to those of a lookout, namely, the duties of navigator and helmsman. The required lookout must have "no other duties which detract in any way from the keeping of a proper lookout." Farwell, The Rules of the Nautical Road 358 (3d ed. 1954) and *see, e. g., The Propeller GENESEE CHIEF v. Fitzhugh,* 53 U.S. (12 How.) 443, 462, 13 L.Ed. 1058 (1852). Such fault on the part of both vessels invokes the so-called Pennsylvania Rule which burdens the violating party(s) by requiring a showing "not merely that the fault might not have been a cause of the collision or that it probably was not, but that it could not reasonably have been." *California v. Italian Motorship ILICE,* 534 F.2d 836, 839 (9th Cir. 1976) and *see also The PENNSYLVANIA v. Tropp,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874); *The DENALI,* 112 F.2d 952 (9th Cir. 1940). Both vessels have failed to make such showing.

■ 2. Both vessels were operated in violation of International Rule 28(a), 33 U.S.C. § 1090(a), which requires all course changes made by power vessels in sight of one or more other vessels to be announced by appropriate whistle blasts. Each vessel altered course at least twice prior to collision in sight of other vessels including its counterpart vessel in this case without so signaling. Neither vessel has made the exculpatory showing necessitated by the Pennsylvania Rule to avoid an adverse finding based upon such violations.

■ 3. EAST POINT was operated in violation of International Rule 18, 33 U.S.C. § 1080, in undertaking a starboard-to-starboard passing in a meeting situation which required a port-to-port passing. Again, EAST POINT has not rebutted the Pennsylvania Rule presumption of contributory fault due to such violation.

4. I further conclude and reiterate that there were no "special circumstances" present herein within the meaning of International Rules 27 and 29, 33 U.S.C. §§ 1089 and 1091, to except this meeting situation from the operation of the aforesaid port-to-port directive. The rules relating to special circumstances "have been narrowly construed, and will not excuse a violation of the plain mandate of more specific Rules, merely because the navigator thinks it best to maneuver in some other way than in accordance with their provisions." G. Gilmore & C. Black, The Law of Admiralty 508 (2d ed. 1975). The existence of several other vessels in the vicinity at the time of collision does not create a special circumstance. In fact, it tends in general to strengthen the need for strict adherence to the specific rules to avoid surprise and embarrassment to neighbor vessels.

■ 5. EAST POINT was indisputably operated in violation of the officers' competency requirements of 46 U.S.C. § 224a in permitting an unlicensed crewman, Paul Vaaga, to act as mate on the 1800–2400 watch, August 28. Furthermore, in view of the very heavy burden facing a party seeking to overcome the presumption of contributory fault once a statutory violation is revealed, EAST POINT might well be charged with such fault herein. *See, e. g., The NEW YORK MARINE NO. 10,* 109 F.2d 564 (2d Cir. 1940). Nonetheless, I prefer not to rely on this violation in fixing fault and liability in these circumstances. Rather, I deem Olson's conduct in absenting himself from the EAST POINT's wheel-

house during critical minutes immediately prior to collision, thereby leaving the vessel's navigation in the hands of unlicensed crewmen, to be more significantly culpable conduct. His departure at such time constituted negligence which I find contributed to the collision.

6. Last, and perhaps most deserving of censure, is the hazard posed by the EAST POINT processing house. The moment the vessel left Kempff Bay with that structure substantially impairing forward visibility, the seeds of disaster were sown; seeds which ultimately blossomed into the collision here at issue. While this structure remained in place, EAST POINT was a casualty in being. It posed a serious danger to EAST POINT herself and a menace to other vessels in her path. The hazardous nature of this structure is persuasively established by photographic exhibits, testimony of EAST POINT personnel including her master and testimony of BELUGA crewmen who were taken aboard EAST POINT post-collision.

7. Under the comparative negligence standard inaugurated in *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), it is culpability, not degree of causation, by which liability is apportioned between wrongdoers. *See, e. g., Pan-Alaska Fisheries, Inc. v. Marine Const. & Design Co.*, 402 F.Supp. 1187, 1188 (W.D.Wash.1975). Mindful of this rule and consistent with the above findings and conclusions, I hold EAST POINT to be primarily culpable herein. Accordingly, and upon weighing the misconduct of the respective vessels, I fix the fault for this collision as follows: EAST POINT and her owners 65% at fault; BELUGA and her owners 35% at fault.

Counsel for plaintiffs shall forthwith prepare and submit an Interlocutory Decree in conformance herewith. If the parties are unable to agree upon damages within 30 days from the date hereof, a Special Master will be appointed for the purpose of so determining.