Robert D. NEHUS, Plaintiff,

v.

ALASKA MARINE TOWING, INC., a Washington Corporation; Pacific Hawaiian Line, Inc., an Oregon Corporation; Marine Challenger, Official No. 569743, and Norton Sound, Official No. 505661, Defendants.

No. C80–187.

United States District Court,
W. D. Washington.

July 1, 1981.

Michael H. Williamson of Madden, Poliak, MacDougall & Williamson, J. Carl Mundt and Jay H. Zulauf of Mundt, MacGregor, Happel, Falconer & Zulauf, Seattle, Wash., for plaintiff.

Patrick E. Pressentin of Detels, Draper & Marinkovich, Seattle, Wash., for defendants.

## MEMORANDUM OF DECISION

BEEKS, Senior District Judge.

In this action plaintiff seeks to recover damages to the vessel NIRVANA arising out of a collision occurring in Alaskan waters in July of 1978. The basis of plaintiff's claim is negligence, and much of plaintiff's case rests upon the presumption of fault which exists when a moving vessel strikes a vessel that is moored or otherwise stationary. Defendants have attempted to rebut the presumption by evidence indicating that plaintiff's negligence caused or contributed to the accident. Trial on the issue of liability was had before this court on June 1, 1981.

## BACKGROUND

Plaintiff is the owner of NIRVANA, a small fishing and crabbing vessel of wooden construction, approximately 46 feet in length, 15 feet in breadth, and 7 feet in depth. The defendants are MARINE CHALLENGER, a 5000 hp. steel tug, 141 feet in length, 33 feet in breadth, and 16 feet in depth; its owner, Alaska Marine Towing, Inc.; NORTON SOUND, an unmanned, non-selfpropelled seagoing barge of 3862 gross tons, approximately 324 feet in length, 68 feet in breadth, and 24 feet in depth; and its owner, Pacific Hawaiian Line, Inc.

On the morning of July 13, 1978, MARINE CHALLENGER, with NORTON SOUND in tow, arrived in Captains Bay from Nome, Alaska. Captains Bay is located on the Bering Sea side of Unalaska Island, one of the Aleutian Island chain and, being located in the vicinity of Dutch Harbor, is well known to Alaskan fishermen. For various reasons, the facility in Captains Bay where cargo aboard NORTON SOUND was to be discharged would be unavailable for an extended period of time. Much of the cargo aboard the barge, however, consisted of construction materials destined for the Pan-Alaska Fisheries dock in nearby Iliuliuk Harbor, and so, at the request of Pan-Alaska, it was decided by the master of MARINE CHALLENGER, Earl A. Cole, that NORTON SOUND would be taken to that dock for discharge. Due to the size of the barge, it was necessary to take a route northward around Amaknak Island and swing through East Channel in Iliuliuk Bay.

As indicated, NORTON SOUND is a very large barge with a high freeboard, difficult to maneuver in narrow channels. For this reason Cole wanted to be sure that East

Channel and the docking area were clear. Cole believed that with a clear channel he could safely conn the vessels into the dock area. During the day on July 14, 1978, Cole personally aided in clearing the area of a number of vessels which might have obstructed or hindered maneuverability of tug and tow.

During this time, and for the previous three days, NIRVANA was moored alongside a large blue barge of over 200 feet in length, which was used by Pan-Alaska Fisheries as a barracks facility for its employees. The barracks barge was permanently moored to the east of the Pan-Alaska dock and was positioned with her stem nearest the dock, her starboard side facing the channel, and her position roughly parallel to both the channel and the shore. NIRVANA was located approximately amidships on the starboard side of the barracks barge.

Cole requested Pan-Alaska to have NIRVANA moved. Although plaintiff was not in Unalaska at the time, Robert Paulis, who then owned a one-half interest in NIRVANA, resided in Unalaska. A Pan-Alaska representative attempted to contact Paulis to request that NIRVANA be moved but was unable to find him. Cole, assuming incorrectly that NIRVANA would be moved, left for Captains Bay to tow NORTON SOUND to the dock. Thus, when MARINE CHALLENGER brought the barge around Amaknak Island on the approach to Iliuliuk Harbor, NIRVANA was still moored to the barracks barge.

For the trip from Captains Bay, NORTON SOUND was towed astern, but when the vessels reached a point in Iliuliuk Bay, just off the entrance to Dutch Harbor, they slowed to a dead stop and MARINE CHALLENGER changed position, making her port side fast to the after starboard quarter of NORTON SOUND. Using three lines— headline, springline, and sternline—Cole secured MARINE CHALLENGER to NORTON SOUND in such a way that although the tug could best maneuver the barge in the channel, visibility was considerably obstructed. The vessels then proceeded approximately south-southwest (215°T) towards the bend into East Channel. To serve as lookout and to guide the approach of the vessels by walkie-talkie, Cole headed for the stem of NORTON SOUND some 300 feet distant and well above the tug's wheelhouse. He left for the stem shortly after the vessels were made fast together, and reached it as they finished their bend into East Channel. The approach to the channel requires that vessels come around a buoy to a heading of roughly west-northwest (350°T). Beyond this turn, East Channel is a straight passage of approximately one-quarter nautical mile in length which narrows in width from roughly 600 feet at the first buoy to about 190 feet at a point between Pan-Alaska's dock and the EAST POINT, a permanently moored processing vessel which is attached to a dock on the north shore of the channel. The width of this short channel at the point where NIRVANA was moored did not exceed 500 feet.

About the time Cole finally made it to his chosen lookout station, a wind, known locally as a williwah, was blowing from the northeast at about 15 knots. This wind caused tug and tow to set left towards the south shore. By this time they had reached a point where the tug could not back out of the channel and had to continue towards the dock. It was only then that Cole first spotted NIRVANA. By walkie-talkie he ordered a burst of acceleration to increase rudder power and bring the vessels upwind. NORTON SOUND, however, was not responding well, and she was traveling at excessive speed due to the wind and power burst. As Cole continued to give corrective orders, the port side of NORTON SOUND struck NIRVANA, lifting her out of the water, pinching her up against the barracks barge and, as the barge moved on, dropping her back into the water with an obvious list.

Cole then ordered that MARINE CHALLENGER reverse engines to prevent a second collision with the EAST POINT. The vessel's crew put a line onto the barracks barge but by then some of NORTON SOUND's cargo of crab pots had been impaled onto a boom extending out from EAST POINT. Fortunately, the hulls did

not collide and thereafter the crew was able to breast NORTON SOUND along the Pan-Alaska Dock.

No one was on NIRVANA at the time she was struck but Robert Paulis arrived soon afterward. Cole went to NIRVANA immediately after the tug and tow were safely moored to ascertain whether assistance was needed. After extensive repairs, NIRVANA was able to engage in crab fishing and did so shortly after commencement of the season.

### PRESUMPTION OF FAULT

■ When a moving vessel strikes a vessel which is moored or at anchor, there is a presumption of fault against the former. *The OREGON*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895). This presumption shifts the burden to the moving vessel to establish 1) that it was without fault, or 2) that the collision was occasioned by the fault of the non-moving vessel. Defendants have failed to sustain this burden.

■ From the testimony it is clear that there was not a proper lookout positioned during the approach to East Channel and that once in the channel the vessels were moving at excessive speed. Earl Cole was to act as lookout and to do so he climbed from the after starboard quarter of NORTON SOUND, where the tug had made fast, to her stem. This was a time consuming journey because of various obstacles along the way, including a vertical frame every ten feet which he had to step around. By the time he reached the stem, tug and tow had moved from a point near Dutch Harbor to the first buoy at East Channel. It was during daylight hours and the weather was clear. On these facts, and finding the speed of defendant vessels at this time to be under one nautical mile per hour, I conclude that tug and tow had at least 30 minutes with an unobstructed view of both the docking facility and the location of NIRVANA. Had a proper lookout been

in position during that crucial period, NIRVANA would have been observed, and if Cole had perceived a likelihood of collision, he may have elected not to enter into East Channel at that time. Instead, Cole did not reach his lookout position until after the vessels rounded the buoy and had passed a "point of no return." Failure to have a lookout in that situation constituted negligence and, additionally, raised a second presumption of negligence under the so-called Pennsylvania rule. *The PENNSYLVANIA v. Tropp*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

■ When a vessel is shown to be in violation of a statute intended to prevent collisions, the violator has the burden of showing that the fault could not reasonably have been a cause of the collision. *California v. Italian Motorship ILICE*, 534 F.2d 836, 839 (9th Cir. 1976); *Alaska Packers Ass'n v. O/S EASTPOINT*, 421 F.Supp. 48 (W.D.Wash.1976). This rule requires that the violator must come forward and prove, not merely that the fault *might not* have been causative of the collision, but that it *could not* have.

■ MARINE CHALLENGER and NORTON SOUND were in violation of Rule 5 of the International Regulations for the Prevention of Collisions at Sea, 1972,[1] (72 COLREGS). Rule 5 states:

> Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and risk of collision.

33 U.S.C.A. foll. § 1602 (1978). As indicated, on the evidence presented it is clear that defendant vessels approached East Channel without such a lookout. Defendants have failed to show this could not reasonably have been a cause of the collision and, indeed, I find that this negligence was a substantial element of causation. In

---

1. 33 U.S.C. § 1602 authorized the President to proclaim these rules, which he did on January 19, 1977, and they entered into force for the United States on July 15, 1977. Known as the 72 COLREGS, the rules are set out in full at 33 U.S.C.A. foll. § 1602, and are applicable to the sounds, bays, harbors, and inlets of Alaska pursuant to 33 C.F.R. § 82.1705 (1980).

short, defendants' fault is manifest, with or without the presumptions referred to above.

Defendants argue, however, that plaintiff is also at fault. Although defendants have alleged various bases of plaintiff's fault, they have established none.

■■■ Defendants also contend that plaintiff should be put to the burden of the Pennsylvania rule because NIRVANA was moored in violation of the provisions of Rule 9 of 72 COLREGS, as well as 33 U.S.C. § 409, both of which prescribe the mooring or anchoring of vessels in navigable channels so as to obstruct the passage of other vessels. I find that these provisions do not apply, however, because NIRVANA, as she was moored at the time of the collision, was not a hazard to navigation. The regulations upon which defendants rely, and 33 U.S.C. § 409 in particular, do not absolutely prohibit the mooring of vessels in navigable channels, but are intended to prevent anchorage or moorage in a way which would monopolize such a channel, and there is no violation where, such as here, a sufficient passageway exists where other vessels can pass in safety when navigated with proper care. The BOSTON MARU, 20 F.2d 508 (9th Cir. 1927); The GRAND MANAN, 208 F. 583 (D.Maine 1913).

## CONCLUSION

■■■ There is no evidence to support a finding of negligence on the part of Pacific Hawaiian Line, Inc., and plaintiff's action against said defendant is dismissed with prejudice and costs. The remaining defendants' negligence in both failing to provide a proper lookout at a critical time and in traveling at excessive speed solely caused the defendant vessels to collide with NIRVANA. Furthermore, none of defendants' contentions of contributory negligence are

meritorious. Nor was this an inevitable accident, or the result of inscrutable fault. Defendants' contention regarding unpredictable winds is an insufficient basis for exoneration from liability when, as here, the very nature of the wind's unpredictability is well known and must always be taken into account by the prudent seaman.[2]

Accordingly, plaintiff is entitled to recover his provable damages. The parties are directed to appear at a status reporting conference on July 30, 1981, at 11:15 a. m., to determine a date upon which to hear the issue of damages. This Memorandum of Decision shall constitute the court's findings of fact and conclusions of law on the issue of liability pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

**2.** "The weather in the Aleutians is characterized by persistently overcast skies, high winds, and violent storms. No other area in the world is recognized as having worse weather in general than that which the Aleutian Islands experience." 9 United States Coast Pilot 165 (7th ed. 1964). Williwahs frequently occur in the Aleutian Islands and are known to be sudden, violent, and unpredictable. The local topogra-

phy will determine the direction from which williwahs will blow and the probability of such a wind at a particular station is governed by the pressure pattern at the time. *Id.* at 19. The court takes judicial notice of the United States Coast Pilot as it has done in the past. *See In re New England Fish Co.*, 465 F.Supp. 1003, 1007 n.4 (W.D.Wash.1979).