### THE BARON JEDBURGH.

### WHEELER–OSGOOD CO. v. HAGARTH SHIPPING CO., Limited.

(District Court, W. D. Washington, S. D.   May 31, 1924.)

No. 4339.

1. **Admiralty** ⊜6—**Suit for injury to dolphins for mooring of log booms held not within the admiralty jurisdiction.**

Dolphins, placed by private parties at a distance from the shore of a bay for the mooring of log booms, *held* not maritime structures, and a claim for their injury not within the admiralty jurisdiction.

2. **Logs and logging** ⊜19—**Steamship held in fault for drifting from anchorage and breaking log boom.**

A steamship, light, anchored in a harbor at night, which dragged her anchors during a gradually increasing gale, and drifted into and broke a log boom, within a half mile of her anchorage, *held* in fault for not sooner having her engines in use.

3. **Logs and logging** ⊜19—**Measure of damages for loss of logs from boom stated.**

In estimating the damages caused by the breaking of a log boom, scattering the logs, some of which were not recovered, the difference between the scale of the logs when rafted and of those recovered may be accepted as the most practicable measure, to which is to be added the cost of recovery.

In Admiralty.   Suit by the Wheeler-Osgood Company against the steamship Baron Jedburgh; Hagarth Shipping Company, Limited, claimant.   Decree for libelant.

Ellis, Fletcher & Evans, of Tacoma, Wash., for libelant.
Huffer, Hayden & Bucey, of Seattle, Wash., for claimant.

CUSHMAN, District Judge.   Libelant sues to recover for certain damages alleged to have been caused by a collision on the morning of the 25th of December, 1923.   On the 22d day of December, 1923, the Baron Jedburgh, a steamer 425 feet in length, of 4,000 gross tonnage,

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

anchored in Tacoma harbor upon a well-known anchorage ground, dropping the port anchor in 20 fathoms of water, with 65 fathoms of chain, which the evidence shows to have been sufficient for that depth. In a northerly direction, about a half mile distant, off the shore, were certain rafts of logs belonging to libelant. These rafts were each held in booms formed of boom sticks, which were connected with chains. All of the rafts were surrounded in like manner by a single boom, and were moored on the offshore side to a line of dolphins or mooring posts. The rafts extended along these dolphins for approximately 1,100 feet. The dolphins having been destroyed or carried away, the evidence is not clear as to the distance they were apart, probably about 60 or 65 feet.

On the morning of the 24th of December the barometer was falling all day; from 10 a. m. on the fall was rapid; it continued to fall until 3 a. m. on the 25th; in this region the highest winds occur in December and January. A wind velocity, as shown by the instruments of the Weather Bureau located four miles distant, was as follows:

| Date. | Time. | Wind Velocity per Hour. |
|---|---|---|
| Dec. 24. | 10 a. m. to 11 p. m. | Very light winds. |
| Dec. 24. | 11 p. m. to midnight. | Average velocity 20 miles, and a maximum velocity for 5 minutes of 30 miles. |
| Dec. 25. | Midnight to 1 a. m. | Average velocity 23 miles, maximum velocity for 5 minutes 36 miles. |
| Dec. 25. | 1 to 2 a. m. | Average velocity 37 miles, maximum velocity for 5 minutes 36 miles. |
| Dec. 25. | 2 to 3 a. m. | Average velocity 37 miles, maximum velocity for 5 minutes 40 miles. |
| Dec. 25. | 3 to 4 a. m. | Average velocity 47 miles, maximum velocity for 5 minutes 52 miles. |

The wind was gusty; the velocity for the highest single mile was 61 miles per hour; the Weather Bureau station was established in 1897; from 4 o'clock on, the wind gradually subsided; from 6:20 p. m. on the 24th to 5 a. m. on the 25th there was light rain. The wind on the 25th had the highest velocity recorded since the Weather Bureau station was established; the next highest velocity was that of a southwest wind December 4, 1907; the next highest that of a southwest wind December 10, 1906; in storms, each winter, the wind reaches a velocity of 40 miles an hour. From midnight to 5 o'clock on the 25th the wind was from the south; the moon was full on December 22d, on the 24th rising at 6 p. m., not setting until several hours after the collision. The Jedburgh was in ballast, was light, with propeller partly out of the water. The night of the 24th and 25th all the crew were aboard the ship. The captain went to bed before midnight. The second officer was in charge on the deck from 12 to 4. Two apprentices were on watch with him, one of whom went to bed at 2, and the other at 4. The third engineer was on watch in the engine room. About 3 o'clock a second anchor was dropped, after which the captain, officers, and engineer were called. The engines were ordered got ready; both anchors dragged slowly, and 10 or 15 minutes before 4 o'clock the vessel had drifted into the rafts, with her port quarter The engines were not started, as by the time they were ready the captain considered his propellers in danger from the logs astern.

299 F.—61

The second and third officers testified that by steaming forward on the anchors the vessel could have been held and the anchors would not have dragged. The second officer, who was on watch, testified steam had been kept up all night, at 160 to 165 pounds. When the engine order came, the engineer's testimony is that in 7 to 10 minutes he had the engines sufficiently warmed up to use them, and he was just going to report to the captain, when the captain ordered him not to start the engine on account of the threatened danger to the propeller.

Between 1:30 and 2 a. m. the rafts and dolphins were still in position. The next morning the dolphins were carried away, certain of the rafts were on the beach, and logs from the broken rafts were adrift and on the beach, opposite where they had been moored and further to the east.

[1] While it is true that the sole use of the dolphins, in the present case, appears to have been as an aid to navigation—that is, to keep the rafts off the shore and to which to fasten the rafts on their voyage to the mills, where the logs of the rafts were to be sawed, and where they would be floated from the mooring when wanted—the function of the dolphins was not that of a wharf or pier, which is, primarily, a facility for loading and unloading vessels; yet the jurisdiction of the court is at least questionable, and, being so, the court must refuse to consider so much of libelant's damages as arose from injury to and loss of its dolphins. They may have been aids to navigation, but they were not government aids. The Blackheath, 195 U. S. 361, 25 Sup. Ct. 46, 49 L. Ed. 236; The Troy, 208 U. S. 321, 28 Sup. Ct. 416, 52 L. Ed. 512; Phœnix Const. Co. v. The Poughkeepsie, 212 U. S. 558, 29 Sup. Ct. 687, 53 L. Ed. 651; Southern Lighterage & Wrecking Co. v. United States (D. C.) 284 Fed. 978, affirmed in 260 U. S. 699, 43 Sup. Ct. 91, 67 L. Ed. 470; The Poughkeepsie (D. C.) 162 Fed. 494, affirmed in Phœnix Const. Co. v. The Poughkeepsie, etc., 212 U. S. 558, 29 Sup. Ct. 687, 53 L. Ed. 651; Evans v. Western Timber & Logging Co. (D. C.) 201 Fed. 461; Benedict on Admiralty (4th Ed.) § 232, and cases cited, notes 177 to 180.

No question is made as to jurisdiction, so far as the question of damages to the rafts is concerned. Seabrook v. Raft Railroad Cross-Ties (D. C.) 40 Fed. 596; McRae v. Bowers Dredging Co. (C. C.) 86 Fed. 344, 347. It must be conceded that the velocity of the wind at 4 o'clock on December 25th was so very unusual as to warrant its being described as "extraordinary," at least so far as this port is concerned. Nevertheless it could not be held that the cause of damage was vis major, for it was no more than a gale at any time, as that term is defined by the Beaufort scale, and as understood by mariners. The witnesses in the case have not spoken of the wind other than as a "gale," a "full gale," or "strong gale." The Snap (D. C.) 24 Fed. 292, 293.

[2] The Jedburgh is held in fault for not having her engines in use before she struck the rafts; anchored as she was, near these logs on a lee shore, under the circumstances this was a clear fault; no fault upon the part of the rafts has been shown. Claimant is allowed full damages to the rafts, resulting from the collision.

I am convinced that the collision occasioned the breaking of the dolphins and the rafts. The evidence shows that other rafts within

a boom, similarly fastened to similar dolphins, and similarly exposed to the force of the wind, whose nearest point was about 200 feet to the west of the broken rafts, was undamaged. It has been argued that, as the Jedburgh struck the rafts on her quarter, not over one-third of her length coming in contact with the rafts, it is unreasonable to hold that she was the cause of carrying away of a line of dolphins 1,100 feet in length. The testimony is that she would have done so, if she swung on her anchors. The wind at 4 o'clock was coming in gusts, and, whether she swung on her anchors or no, it is reasonable to presume that the collision was the proximate cause of the dolphins being carried away. After striking the rafts the Jedburgh pivoted on her port quarter, so that the wind, striking on her starboard beam, held her against the rafts. She was light, one-third of her propellers out of water; her side must have presented a considerable surface exposed to the force of the wind. The heavy logs lying in the water were exposed but very little to the wind. If the Jedburgh did not swing on her anchors, her pressure on the rafts, as they were in no sense rigid, was doubtless transmitted to those of the dolphins opposite to the point of collision; these were first carried away; this increased the strain on the dolphins at each end of the break, thereby causing the line of dolphins to break, and one by one they were carried away, until all were gone.

[3] Claimant contends that the amount of logs lost from the broken rafts has not been shown; the showing was made by a scale of the logs collected after the breaking of the rafts, and the loss established by comparing this rescale with the scale of the logs made when they were rafted. There is no evidence of any loss between the time of the original scaling and the time of the collision. The scaling of logs is partly based upon the judgment of the scaler, and two scalers seldom exactly agree. This method, however, would appear to be the only practicable way to determine the extent of the loss. Libelant will be allowed the shortage shown by the rescale, and also the cost of such rescale. Libelant will also recover the time of its employees taken from other service while engaged in recovery of the logs. The other various items of resulting damage have been clearly established by the evidence, and are not otherwise than as above, in dispute.

Decree for libelant, except as to the lost dolphins.